KANSAS PACIFIC RAILWAY CO. *v.* MILLER, administrator.

EVIDENCE — *circumstantial.* Discussion of the sufficiency of certain circumstances to establish the allegation of the death of plaintiff's intestate, in an action for injuries resulting in death, under the statute, the question being one of identity of person.

*Pedigree.* Declarations of a decedent, contained in letters shown to have been written by him, are competent to show his marriage.

Documents purporting to be transcripts from certain official registers, found in the baggage of a railway passenger, who was killed in an accident, were held admissible upon the question of his marriage, without evidence of their authenticity.

In the same case, the decedent, whose family relationship was in issue, had, next before his death, been found traveling in company with a woman, and certain young children, toward whom these adults were observed to perform the office of parents ; the baggage inferentially shown to belong to deceased, contained wearing apparel, apparently suitable to all the

party in common, these circumstances were held to afford an inference that the relation of husband and wife existed.

*Handwriting — letters.* M. had resided at Brackenheim, in Germany, and there knew one B., then a youth; many years after his removal to this country he received a letter from B., and replied to it, addressing his reply to B. at Brackenheim; to this letter he received a response, purporting to come from B., and bearing the post-mark of Brackenheim, and that of New York; *held,* that the letters received by M. were admissible, as the letters of B., without further evidence of the handwriting of B.

The cases of *Harrington* v. *Frey,* 1 Ry. & Mood. 90, and *Tharpe* v. *Gisborne,* 2 C. & P. 21, cited with approval.

*Secondary.* Party who attempts to raise a presumption that certain letters are in the handwriting of his deceased intestate, from the fact that they were received by himself by post, in response to letters addressed to decedent at his place of residence, must produce the envelopes in which such letters were received, and bearing the post-mark, if in existence.

Case by administrator for negligently causing the death of his intestate, under the statute, upon the question of the identity of a deceased person, killed by an accident, upon the defendant's railroad, with the plaintiff's intestate, it was shown that, upon demand for the baggage of the persons who had been killed in the accident, certain boxes had been delivered up by the officials of the company, and it was held that the inscriptions upon the boxes might be given in evidence, without producing the boxes

*Public documents — originals admissible.* The statute directs letters of administration to be preserved in the probate office, and makes transcripts thereof evidence. *Semble,* the originals are admissible.

*Admissions by conduct.* Case by administrator for injuries resulting in the death of his intestate, by the subversion of a bridge on defendant's railway, by which the train wherein intestate was traveling was wrecked; *held,* that the subsequent construction of a new bridge over the same channel, in a different manner, amounted to an admission that the former one was improperly constructed.

But not that these defects were attributable to negligence. In the same case, for the purpose of showing that a person who came to his death by an accident on defendant's railway was the plaintiff's intestate, plaintiff was permitted to show that the deceased person in question was buried at the instance of the superintendent of the company, and then to inquire whether any name was inscribed upon the head-board which marked the place of burial.

*Relevancy.* The question being as to the character of a stream, a railway bridge over which had been destroyed by a flood, and whether the defendants were negligent in not foreseeing and providing against such occurrence; *held,* that evidence of floods subsequent to that which occasioned the injury was improperly received.

Error in receiving irrelevant evidence may be cured in some cases by an instruction to the jury to disregard it.

*Opinions of witnesses.* A witness who had ridden in a railway train with a party composed of adults and children, during a portion of two days, was permitted to express the opinion formed from the observation of their demeanor and conduct, their dress, conversation and general appearance, that they were of one family, and of German nationality.

A witness may express an opinion of the age of a child from its size and general appearance.

PRACTICE — *rebutting.* Case, for negligence in the construction of a railway bridge, which, being undermined by a flood of waters, fell under the train in which plaintiff's intestate was being carried. Plaintiff, in opening, gave direct evidence of faults and negligence in the construction of the bridge ; that the injury occurred by reason of the washing away of an embankment, forming the eastern approach to the bridge ; that this embankment had been carried out from the eastern bank, into the deepest part of the channel; that it was composed of light and unsubstantial material, liable to yield to the action of water; that, at the time of the construction of the bridge, there existed indications of a previous flow of water there, and that the attention of the engineers was called to these circumstances. After the defendant had closed his evidence, which was directed to show, among other things, that no such indications of a previous flow of water there existed at the time of the construction of the bridge, or afterward, the plaintiff was permitted to call a witness, to show that at the time of the construction of the bridge, there were saplings growing upon the low ground in the immediate vicinity of the bridge, and that to the distance of two or three feet from the ground these saplings bore water-marks. This was held to be within the discretion of the court.

DAMAGES. Exemplary, are not to be given for mere error of judgment not accompanied with negligence, evidencing an indifference to consequences.

STATUTES — *construction of.* Where a statute gives an action in a new case, and no rule for estimating the damages is given, those ordinarily applicable in like cases, at the common law, must be held to govern.

RAILROADS — *diligence required.* It is the duty of a railroad company, in its capacity as a carrier of passengers, to exercise the highest degree of care in the construction and maintenance of its roadway, and the appurtenances.

But the carrier is not liable for injuries resulting from an accident against which the highest degree of skill, foresight and diligence would have been unavailing.

Where the company located a bridge over a channel then containing no water, and wherein no flow of water was known to have occurred ; *held,* that due diligence required an inquiry and examination as to its character and the declivity of the circumjacent country, to ascertain the quantity of water likely to flow there in the future; that if indications existed in the vicinity, of former floods, *e. g.*, drift-wood and the like in the branches of bushes, or water-marks upon the trunks of trees, it was gross negligence to construct the bridge with its approach of light and unsubstantial soil, reaching into the water-way.

A violent storm occurring near the sources of a channel or water-way, ordinarily dry, was observed at a station on the railway, nine miles distant from a bridge, by which the road crossed the channel in question. *Held,* that diligence required of the agents of the company to examine the bridge after the storm, and before the passage of trains.

PRACTICE — *examination of witness by the court.* Plaintiff had given evidence in his own behalf, to lay the foundation for the admission of certain letters. After his examination by counsel upon both sides was completed, and the witness had been discharged, the admissibility of the documents being yet doubtful, the presiding justice of his own motion recalled him, and propounded questions, the answers to which tended to show the letters admissible ; *held,* not an abuse of the discretion of the court.

PRESUMPTIONS — *death of husband and wife by the same casualty.* Where two persons, husband and wife, are shown to have perished in the same casualty (the wrecking of a railway train by the giving way of a bridge), nothing appearing to the contrary, it was said to be a presumption of law that they died at the same moment.

JURY — *questions for.* When an injury to a passenger upon a railway train is shown to have been occasioned by the giving way of a bridge on the line of the road, it is for the jury to ascertain whether the occurrence was due to faults in the construction of the bridge or to other causes.

*May refer to their own experience.* In case by the administrator to recover for injuries occasioned by negligence and resulting in the death of his intestate, it was said that the jury in estimating the damages should take the facts in proof, and connecting them with the knowledge and experience possessed by them in common with men in general, arrive at a rule which should be just between the parties.

NEGLIGENCE — *evidence.* When an injury occurs to a railway passenger, by reason of the giving way of a bridge under the passing train, proof of the casualty is *prima facie* evidence of negligence in the location or construction of the bridge, or in both its location and construction.

So, too, where the subversion of the bridge appears to have been occasioned by an unusual flood or freshet.

*Aliter.* Where the injury occurs from causes entirely foreign to the apparatus or operations of the road.

NEGLIGENCE RESULTING IN DEATH — *surviving descendants necessary.* In case, under the statute, for injuries occasioned by negligence and resulting in the death of the party injured, the existence of any of the descendants or kin named in the statute, suffices to maintain the action.

*Character of the administrator as plaintiff.* The administrator is a mere nominal plaintiff, suing for the benefit of the surviving widow or children.

*Damages.* When the injury is the result of wantonness, violence or gross negligence, exemplary damages may be given.

*Semble.* That where an interval of time occurs between the injury and death, nothing is to be allowed for the suffering of the injured party during this time.

The anguish of the survivors is not to be considered in estimating the damages.

Manner of estimating damages in such case, and the elements which enter into the computation considered.

WATER-COURSES — *extraordinary freshets.* A railway company in carrying their road across a water-course or channel, are bound to provide for even those extraordinary floods which, by the exercise of the highest circumspection, may be anticipated.

*Appeal from District Court, Arapahoe County.*

CASE by the administrator, suing for the use of the surviving children, for injuries occasioned by the negligence of the defendant and resulting in the intestate's death.

The statute, which gives the action (Acts 1872, p. 117), declares that " when the death of any person is caused by the wrongful act, misconduct, negligence or omission of another, the personal representatives of the former may maintain an action therefor against the latter, if the former might have maintained an action had he or she lived, against the latter for the same act, misconduct, negligence or omission, *proviso*, that the action be commenced in two years, and that the damages shall inure to the exclusive benefit, first of the husband or wife, if living, and if there be no husband or wife, to the child or children of the deceased."

Miller, as administrator of David Buger, deceased, brought his action against the railway company for causing the death of his intestate by negligence, while being transferred as a passenger for hire on one of the cars of the company. In two counts the declaration attributed the injury to negligence in the construction of a bridge, by means whereof the car was thrown down, broken, etc. Other counts alleged negligent conduct in general without specifying the particulars of such negligence, and each count alleged that the intestate left two minor children, named, to whom the damages might be distributed.

The issue was tried at the April term, A. D. 1873, before the Hon. EBENEZER T. WELLS and a jury.

It was admitted that one David Buger, alleged to be the plaintiff's intestate, was a passenger for hire upon the defendant's train, before, and at the time of the alleged accident.

The locality of the accident was at a bridge or trestle over what is commonly termed Coon creek ; the stations nearest are Mirage, about one mile to the east, and Hugo, about nine miles to the west from the trestle.   The railway at this point runs nearly east and west, pursuing the valley of the Big Sandy creek.

The trestle in question, though spoken of as the Coon creek bridge, is in reality located in a semi-circular basin formed by a bend in which the Sandy formerly flowed ; Coon creek proper has its source or beginning in a divide about nine miles to the north, and empties into the old channel of the Sandy about 1,100 feet above the trestle.

The trestle was constructed in June or July, 1870 ; at that time there was a defined channel of Coon creek for six or seven hundred feet above its mouth, at the old bed of the Sandy ; in places there was water standing in pools ; the channel was from 25 to 30 feet in width, and with banks sloping in some places and precipitous in others; above that, there were places where the water had cut gullies or holes, but no continuous defined channel, and for three miles or more at the head of the valley there were no indications of the passage of water there at any time; there were numerous dry ravines opening into this valley, but none wherein water had ever been seen to flow.   There was testimony tending to show that, at some former time, the course of Coon creek had carried it to the Sandy, considerably to the east of the trestle, and crossing the line of the railroad half way between that and Mirage station.

The mouth of that channel by which, on the occasion in question, the flood entered the old channel of the Sandy, is, as before said, about 1,100 feet above the trestle ; from this point to the trestle the ground descends gradually toward the trestle.   The old bed of Sandy has upon its eastern and northerly boundary a bank nearly perpendicular at the top, and with a slope at its foot.  The height of this bank is about 13 feet.

The bottom of the old channel was everywhere nearly level across its whole width, the testimony being in conflict

as to whether the lowest point was close under the eastern bank, or at some distance from it. At the time of the construction of the bridge this old channel was filled with sand in places, and everywhere else was covered with grass and weeds. Prior to the accident, no water had ever been seen to flow there, or at any point in either channel of Coon creek; though besides the bluff bank of Sandy, and the water-worn channel of Coon creek, Keating, a witness examined for the plaintiff in chief, swore that at the time of the construction of the bridge, the bank of the old channel of Sandy exhibited traces of the action of water, and John Burk, a witness for the plaintiff, against the defendant's objection, testified in rebuttal to having seen at the time of the construction of the bridge, water-marks upon saplings growing in the vicinity. Storms had frequently occurred in that region, but a flood of such volume as the one which occasioned the accident, had never, according to the testimony, been previously known. As originally constructed, the bridge was formed of a trestle upon piles five or six bents, each of 15 feet in length ; from the east it was approached by an embankment of dirt about eight feet in height, and extending into the dry bed of Sandy creek, from 30 to 50 feet,— as to its length the witnesses varied in their recollections; the foot of the western slope of this embankment was near the easternmost row of piles. As to whether this embankment did or did not extend across the lower part of the old channel of the Sandy, was a point upon which the witnesses were not agreed. The trestle was connected with this embankment by stringers, which had a bearing of eight feet or more upon the embankment. From the east the railway approached this trestle through a cut 800 feet long, and the eastern embankment was composed of sand, or clay and sand taken from this cut. The witnesses agreed that it was of inferior character for such a purpose, but the best that the region offered ; no stone was found nearer than 100 miles distant, or thereabouts. The witness, Keating, who, working under a contract, had superintended the grading this portion of the road, swore

that he extended this embankment according to his own discretion ; that he had instructions to leave a 70-foot opening for water-way, and that, originally, the engineer had directed that this opening should be left next the eastern bank, and that the material from the cut should be wasted at the side of the roadway ; that when witness had requested permission to carry the material into the bed of Sandy, thereby forming an embankment there, the engineer had at first refused, but afterward yielded, instructing him, however, to leave the same opening. Witness further deposed, that he had, during the progress of the work, called the engineer's attention to the evidence of a former flow of water there, and the probability that this embankment would be washed out.

The defendant gave evidence that at about 100 to 150 feet above the trestle there was a projection from the eastern bank of the Sandy which, in the opinion of the engineer, would divert the water from the eastern embankment. The professional witnesses generally agreed that the bridge, as originally constructed, exhibited no lack of care or engineering skill. Subsequent to the accident, however, it was shown that the defendant had reconstructed the bridge, leaving a wider water-way. This evidence was received against defendant's objection, and an exception was reserved.

A witness who resided at Hugo station, testified that on the evening previous to the accident, a violent storm had been observed, near the head of Coon creek, apparently, accompanied by violent thunder and lightning, and an unusual roaring ; and that these appearances had been the subject of general conversation at the hotel in Hugo.

No evidence was given of precautions taken by the employees of the railroad company in view of these appearances.

Witnesses sworn for the defendant testified to having been at the trestle late in the evening previous to the accident ; that but a slight shower occurred there or anywhere

in the neighborhood of Mirage, and the channel was perfectly dry.

The western bound train which had left Kansas City on the evening of the 27th reached Mirage at 1:15 of the morning of July 29. The night was cloudy and dark. As the train approached the trestle its speed was about 15 miles per hour; the head-lamp was burning and enabled the engineer to see the rails for the distance of 300 to 400 feet.

The rails were in place and no indication of the insecurity of the bridge appeared. In fact, by a flood of water coming down Coon creek entering the old channel of Sandy above the bridge, the eastern embankment had been washed away so that the stringer constituting the approach to the bridge being sustained by the rail merely, and without support from beneath, yielded under the weight of the train. The engine leaped the chasm, but the baggage car fell and the second car colliding with this was broken in pieces. The water in the old channel of Sandy was then from three to five deep feet and running with great violence.

The evidence failed to show any defect in the equipment of the train, or negligence in its management. The plaintiff gave evidence, by a witness who had traveled upon the train from Kansas City, that in the second-class car were eight or ten passengers; that among them were one party of five or six, three of them being children; that one of these children was eighteen months old or thereabouts, one three or thereabouts, and the other seven or eight; the eldest child was a girl, the other two, boys. The witness was permitted, against the objections of the defendant, to express the opinion formed from the conduct and demeanor of the party, that they were all of one family; and the opinion, formed from observing their dress, general appearance and conversation, that they were of German nationality; though the witness professed himself not well acquainted with the German language. The witness deposed that the adults of this party were killed in the accident, while the children survived. This witness, and an undertaker who laid out and buried the bodies, deposed

with particularity to the physical appearance of the man of this party, who was found dead after the accident, and this description corresponded with that given of John David Buger, the elder in the documents afterward introduced. On the day following the accident, the bodies of the dead, and the wreck of the train, with the baggage of the passengers, was conveyed to Denver, and plaintiff gave evidence that on the 30th a witness had called at the baggage-room of the depot used by defendant and two other companies for the baggage of the people who were killed on the railroad ; that the baggage-master had directed him to go to the office of the superintendent of the defendant and get the checks ; that he went to that office and informed one of the clerks that he wanted the checks for the trunks of those German people who were killed on the road, by the name of Buger ; that upon being interrogated as to his authority, he had replied that Mrs. Shirmer sent him ; that the clerk thereupon gave him two or three checks, and that upon these he obtained certain wooden boxes or chests, banded with iron, and such as are called emigrant chests.

The witness further stated that his purpose in seeking the trunks was to obtain clothing for certain German children whom he had first seen on that day at the house of Mr. Shirmer ; that there were three of the children, one a girl, eight or nine years old, the other, boys, 16 to 18 months, and two to three years of age, respectively ; they spoke German, and the older boy said his name was Charley Buger. The witness was permitted to speak of the age of the children from their size and general appearance, defendant reserving an exception. The witness was also permitted to give the contents of the chest against defendant's objection, defendant excepting. They contained men and women's clothing, some of which was marked D. B., and some of the female clothing, A. B., clothing suitable to children of the ages and sex of these children, shoemaker's tools, and certain documents hereafter set forth. This witness and others were permitted to state, against objection, that the boxes

bore the inscription, "David Buger, Botenheim, Bremen, New York."

To prove lawful issue surviving the intestate, plaintiff relied upon the conduct and demeanor of the adults, who came to their death in the accident, both toward the children of the party and each other, and also upon certain letters and the documents found in the chest before mentioned. The plaintiff was sworn in his own behalf, and deposed that he was born in Botenheim in the kingdom of Würtemburg; that he knew one David Buger there, and only one person there of that name; that he had received in 1872, certain letters purporting to come from this person, some of which he produced; they were in the German language and plaintiff deposed that in consequence of the receipt of these communications he had bought in Denver two through tickets and had sent them with a sum of money to New York, in order that the writer of the letters might come to Denver. The witness did not profess to have any acquaintance with the handwriting of the decedent, except as acquired by this correspondence.

After the examination of this witness by counsel of both sides and his discharge, the letters, accompanied by a translation, were offered, and, objection being made, the judge presiding, after an adjournment, recalled the witness, and of his own motion, examined him at length against the objection of counsel for the defendant, and this was made the ground of an exception. Upon this examination the plaintiff swore, that during an 18 years' residence in this country he had maintained a correspondence with friends residing in Botenheim; that his correspondence with Buger commenced on the part of the latter; that witness had responded to this; other letters upon both sides had followed, witness directing his communications to David Buger at Botenheim, and receiving replies; that these letters received by him in this correspondence bore the post-mark Brackenheim (which was the post town nearest Botenheim), and New York.

The envelopes containing the letters offered, witness swore

were destroyed, though he might be able to produce some of those in which the earlier letters of the correspondence (which witness swore was destroyed) had been received, if he were at home.    Upon this showing the court admitted certain portions of these letters as translated.  The first, dated Botenheim, February 16, 1862, and signed, Shoemaker Buger, contained a statement as follows: "My wife is the youngest of your sisters, and I have three children, a daughter of seven years and two boys, one two, and the other one year old."

The second was dated New York, May 14, 1872, and contained the following passage:  "Dear brother-in-law, perhaps you don't recollect me; my name is David Buger, and my wife Augusta Neuschwander.  I have a girl eight years old, a boy of two years, and one of one year; that is my whole family."   The letter also contained the statement that the girl spoken of was born before his marriage.

The third was dated New York, June 11, 1872, and subscribed, David Buger, and repeated the statement of his marriage.

Plaintiff swore that his own name was Neuschwander; that he had assumed the name of Miller many years previous.  The documents found in the chest obtained at the railroad depot were also received, against defendant's objection, accompanied by translations, and were as follows:

1st. An extract from parish register, entitled "Bailiwick Brackenheim, Botenheim," and set forth the illegitimate birth on February 23, 1865, to Augusta Neuschwander of a daughter baptized Marie.

2d. Extract from parish register of the same title and setting forth the legitimate birth, February 18, 1871, of a child baptized John David, to John David Buger and Augusta, daughter of Neuschwander.

3d. Extract from parish register, entitled "Bailiwick Brackenheim, municipality Botenheim," and set forth the legitimate birth, March 5, 1870, of a child baptized Karl David, to John David Buger, shoemaker, and Augusta, daughter of Neuschwander.

4th. Of the like title and character, and setting forth the legitimate birth, March 9, 1842, of a child baptized Augusta, to George Adam Neuschwander and Augusta, daughter of Rucker.

5th. One of the same character and title, setting forth the birth, October 20, 1844, of John David Buger.

All these documents were attested and certified March 25, 1872.

6th. A document purporting to be an emigrant's pass from the Kingdom of Würtemburg to John David Buger, "native of Botenheim, and resident there up to this date, from his home through Baden and Prussia by way of Bremen to North America." A full description of the person was written upon the margin, and the name of his companions were subjoined as follows: "*His wife* Augusta, Neuschwander's daughter, born March 9, 1842. *Children*, Karl David, born March 5, 1870 ; John David, born February 18, 1871; the illegitimate daughter of his wife, Marie Neuschwander, born February 23, 1865."

7th. A discharge from citizenship in the Kingdom of Bavaria to the shoemaker, John David Buger, from Botenheim, Bailiwick Brackenheim, born October 20, 1844 ;" who the paper recited " desires to emigrate to North America."

Plaintiff gave in evidence the original of his letters of administration from the probate office ; objection was made that a certified copy only could be received, and this being overruled, an exception was reserved. The statute (Rev. Stat., ch. 60 and 61, § 10) requires the originals to be kept in the office of the probate judge, and transcripts thereof are made evidence (Rev. Stat., ch. 21, art. 10, § 4).

The court charged the jury that to a recovery by the plaintiff it must appear that Buger died before action brought, leaving one or more children born in wedlock ; that his death was occasioned by negligence of the defendant ; that upon the question of decedent's marriage they might consider the letters read in evidence, and the documents said to have been found in the chests obtained at the railway depot, but that these last were not to be regarded

as official or authentic documents; that their character as evidence depended solely upon whether they were or were not in possession of the intestate in his life-time; that as to the question of negligence the giving way of the bridge, if established, made a *prima facie* case, which it rested with the defendant to overthrow; that the company, though not an insurer against accident to passengers, was bound to exercise the highest degree of care for their safety; that it was not bound to observe every conceivable precaution; but that such as a man of more than ordinary prudence and foresight would put forth in like case to prevent injury to himself it was bound to observe; that in locating its roadway across any stream or water-way, it was bound to inform itself of the nature of the stream and the quantity of water, which might reasonably be expected, and to provide water-way, not only for the usual and ordinary waters of the stream, but for such freshets and floods as, though not usual, might be anticipated by the exercise of the highest circumspection. That if they should find for the plaintiff they might take into account the anguish of mind experienced by the children, upon their bereavement, the loss of the protection and fatherly care of the parent during their minority, and what the father, had he lived, would reasonably have expended for their proper maintenance during minority. That if, upon all the evidence, they were of opinion that the employees of the defendant, at the time of the construction of the bridge, or afterward, must, in fact, have foreseen the probability of such a flood, as the one which was said to have occasioned the accident, and that the consequence might probably be the destruction of passing trains, it was gross negligence not to provide against such consequences, and they might award exemplary damages.

The jury were cautioned, however, not to award exemplary damages for errors of judgment, or for negligence merely not accompanied by an apparent reckless disregard of consequences.

To the giving of each of these instructions, the defendant excepted, and each point of the charge was specially assigned for error.

The jury found the defendants guilty, and awarded damages in $15,000. The defendant moved for a new trial upon the ground of alleged error in receiving and excluding testimony, and in the charge, assigning also for cause, that the damages were excessive, and the verdict against the evidence. This motion the court denied, and judgment was given upon the verdict.

The chief-justice concurred in the result only.

Mr. Justice WELLS dissented.

Messrs. SAYRE & WRIGHT, for appellants.

Mr. E. L. SMITH and Mr. D. W. CRATER, for appellees.

BELFORD, J.   When the plaintiff rested his case, the defendant moved for a nonsuit, on the following grounds :

1st. No negligence proved against defendant.

2d. It did not appear that David Buger is deceased, or if so, that he left any heirs.

3d. That it did not appear that the wife of the intestate, who would be exclusively entitled to damages, is dead.

4th. That the evidence is insufficient to support a verdict. The motion was denied, and the ruling of the court is assigned for error.

The declaration charges that the plaintiff's intestate was a passenger for hire on the defendant's train of cars. That he had made a contract with the defendant to be safely carried from Kansas City to Denver, and that, by reason of defects in the location and construction of a certain bridge over Coon creek, the cars collided, and that Buger was killed ; that he left surviving, as heirs, two children of tender years, etc. The evidence shows that by reason of the giving away of the eastern embankment, on which the bridge rested and abutted, the accident occurred.   That it is the

imperative duty of a railway company to keep their track in a sound and safe condition, cannot be disputed. If it has no track, or a chasm is suffered to exist on it, it is either incapable of performing the duties it has contracted to discharge, or it puts the limbs and lives of its passengers in jeopardy. In this case, instead of carrying the plaintiff's intestate safely over its road, as the defendant had contracted to do, he is killed by the breaking down of a bridge, which forms part of its roadway. The moment such a state of affairs was shown to exist, the presumption of negligence on the part of defendant necessarily arose, and it required evidence on its part to overcome that presumption, and establish affirmatively that no negligence existed on its part, to which the accident could be attributed. This is the doctrine clearly and ably announced in *Brehan* v. *The Great Western R. R. Co.*, 34 Barb. 256, which is a case similar in almost every respect to the one at bar. The presumption of negligence, however, does not attach itself to every injury which may overtake a passenger, while being transported in a car ; it belongs only to that class of accidents where the injury is caused by a defect in the road, cars or machinery, or by want of diligence or care in those employed, or by some other thing, which the company can and ought to control, as a part of its duty to carry the passenger safely, because in all these matters it is the duty of the company to use the highest degree of care to have all their arrangements safe and in good condition. *Meiers* v. *Pennsylvania R. R. Co.*, 64 Penn. St. 225 ; *Curtis* v. *Rochester & Syracuse R. R. Co.*, 18 N. Y. 534 ; Am. Law Review, January No., 1871. Whatever diversity of opinion may exist on the subject of the burden of proof in cases of negligence, the courts seem all agreed in holding that where the accident occurs in one of the ways mentioned above, that is, on account of a defect in the road or machinery, or through the carelessness of the agents employed by the company, the accident is *prima facie* evidence of negligence, and the defendant must establish affirmatively that no negligence existed on its part. *Louis-*

*ville & Portland R. R. Co.* v. *Smith*, 2 Duvall (Ky.), 556;
*McLean* v. *Burbank*, 11 Minn. 277; *Illinois Central R.
R. Co.* v. *Phillips*, 49 Ill. 234; *The Great Western Railway Co.* v. *Baird & Faucett*, 1 Moore's P. C. 101 (N. S.);
*Stokes* v. *Saltonstall*, 13 Peters, 181.

The carrier may, however, rebut this presumption by showing that the injury arose from an accident, which the utmost skill, foresight and diligence could not prevent. It is claimed, however, by the counsel for the appellant, that when the accident occurs from causes entirely foreign to the operation or apparatus of the road, mere proof of the accident is not sufficient. There are cases where it is held, and properly, too, that when an injury is occasioned by an agency disconnected with the operations or apparatus of the road, no negligence will be presumed; for instance, if a passenger in the car is shot by a person without; but we know of no case that excludes the presumption of negligence when the accident occurs from a defect in the road itself, or from that cause concurring with others. When the accident and injury were shown, it then became a question for the jury to determine whether the breaking down of the embankment was owing to faults committed in its construction, or to causes unexplainable, and involving no responsibility on the part of the company, or from the hidden forces of nature and the interposition of a superior power, which no care, skill or precaution on its behalf could avert or control. The circumstances in evidence, when the motion for nonsuit was made, were sufficient to create a presumption of negligence if the law did not raise that presumption from the accident, injury and the destruction of the embankment. It seems to me, therefore, that the motion was properly overruled on the first ground.

As to the second, that it does not appear that David Buger is dead, our holding cannot be different. The stipulation filed by counsel in the court below, admits that David Buger was before the alleged accident, and at the time thereof, a passenger for hire in one of the cars or coaches of the defendant, as stated in the declaration. Does the evi-

dence show that he lost his life in the accident mentioned ? On this subject there is no direct proof, but the circumstances detailed point unerringly to that conclusion.  First, we have the fact that in that train and in the baggage car were three boxes, two of them bearing the name of David Buger, also the name of Botenheim, the town from whence he started on his western trip.  In these boxes was found clothing marked with the letters "D. B." and A. B.," being the initials of David Buger and his wife, Augusta.  Further, we find in them clothing for children, and documents, which, on their face, purport to be transcripts of the parish register, containing the date of the birth of his children and their names.  The evidence further shows, that in the car which was wrecked a German man, two women, and three children of the same nationality were seated ; that they consorted and fellowshiped together as one family.  We further find that this man and the two women were killed, and that the little boy gave his name as Charley Buger.  We have the further fact, that when Stockdorff called at the depot for the checks accompanying the trunks of the German people that got killed on the road by the name of Buger, they were furnished by the employees of the company, and the trunks delivered to him.  We have the further fact, that after the death of these parties, no one came forward as claimant of these boxes, and what is still more significant, no father or mother asserted their parental claims to the bereaved and homeless children.  When children of tender age are found traveling in a railroad car, in a strange land, with a man and woman who seem to care for their wants, and furnish them needed comfort and protection, it is a fair and natural presumption that the parties performing these offices are their parents.  Strangers rarely are found making long journeys with children who have not passed the bounds of nurture. We think, then, that the circumstances above detailed, and others found in the evidence, were sufficient to warrant the jury in finding that Buger was numbered with the slain, and that the children with whom he had been consorting were his own.  Evidence of affection, solicitude and care

under the circumstances cannot be said to have been simulated. The purpose of such conduct is not apparent.

What has been said as to the death of Buger may be said as to the death of his wife. It seems to me, therefore, that upon the evidence before the court at the time plaintiff rested his case, he was entitled to a verdict, and that no error was committed in overruling the motion for a nonsuit. On the trial various objections were taken to the admissibility of evidence to establish the marriage of Buger. A number of letters were admitted which Miller testified to having received from Buger at different times, also documents purporting on their face to be transcripts from the parish register of Botenheim. It is claimed by the appellant that this was secondary evidence, and therefore inadmissible. These letters were received by Miller in due course of mail from Botenheim in Germany, and from New York. Miller, the recipient of them, had been a native of Botenheim, knew Buger when he was a lad, and was acquainted with his parents. The first letter imparts to Miller the intelligence of Buger's marriage with Miller's youngest sister, Augusta, and their intention to embark for America. This letter bears date February 16, 1872. The second letter, dated New York, May 14, 1872, makes mention of the marriage, and that he is there awaiting some assistance from his brother-in-law, Miller. The third letter is of a somewhat similar character. The documents above referred to recite the fact of Buger's marriage to Augusta, and the birth of the children. If this evidence was rightfully received, the proof of the marriage is satisfactory.

Miller testifies that the envelopes in which these letters were inclosed bore the post-marks of Botenheim and New York, and these circumstances must be taken as *prima facie* evidence that the letters were deposited in the offices at those places. If a letter is sent by the post, it is presumed, from the known course in that department of the public service, that it reached its destination at the regular time, and was received by the person to whom it was

addressed, if living, at the place and usually receiving such letters there.    Greenl. Ev., vol 1, § 40.

There can be no question that the identity of the correspondent whose letters have been received, with the party whose handwriting is to be proved, should be established, either by the witness who received the letters, or by other reasonable evidence.    A witness to prove the handwriting of S. F., said that he had never seen S. F., but had corresponded with one S. F. of Plymouth Dock ; that he had so addressed his letters, and received answers from him, and had from that correspondence acquired such a knowledge of his handwriting as enabled him to say that the paper produced was in the same handwriting ; evidence was given that the defendant lived at Plymouth Dock, and that no other person of the same name resided there, and it was held that proof was sufficient.    *Harrington* v. *Frey,* 1 Ry. & Mood 90.    In *Thorpe* v. *Gisburne,* 2 C. & P. 21, the witness said he had never seen the party, but believed the instrument to be in his handwriting, from having received letters from him, upon which he had acted.    BEST, C. J., ruled that this was quite sufficient for the witness to ground his belief upon, which he said was all that was required.    See Phillips' Ev., vol. 2, top p. 503, note 481.

I fail to see why the doctrine thus announced is not applicable to this case.    It seems to us, however, that the envelopes which inclosed these letters should have been produced, if the same were in existence.

It will be conceded that a declaration made by Buger, as to the fact of his marriage, would be held admissible. *Caupalle* v. *Ferrin,* 23 N. Y. 104 ; *Charlotte School* v. *Greenwell,* 4 Gill & Johns. 414.    Is the declaration different when committed to writing ?    Miller swears that he knew of one David Buger in Botenheim, and in absence of opposing proof, we are not called upon to presume that there were others there of that precise name.    It must be conceded that the letters could not have been written for a purpose. It cannot be said that David Buger, or any one else, deliberately set to work to prepare evidence to be used in a case

which could only arise from the fact of Buger's death, growing out of an accident to a particular train on which he was to travel — such prescience as that would be unexampled in judicial history. Standing alone, the letters may be regarded as weak, but when supplemented by the concurrent circumstances, which stamps this case at every point, they were entitled to admission and consideration, upon the production of the envelopes, or the accounting for their loss. The declarations in these letters seem to be verified by facts disclosed throughout the entire evidence. It was also proper to receive evidence as to the inscriptions on the boxes. If the production of the thing on which the inscription is found is indispensable, it would be impossible to proceed in many cases. If a sign were painted on a house, it would hardly be contended that the house would have to be produced, nor can it be said that the law converts the court-room into a receptacle for wagons, boxes, tombstones, and the like, on which one's name may be written. So, too, I think the transcripts of the parish register, under the peculiar circumstances of this case, were admissible as a collateral fact, showing the marriage, especially when regard is had to the place where they were found. It was competent for the plaintiff to have obtained certified copies of these documents, duly authenticated, but it would have entailed considerable cost, and great delay. While courts, in the administration of the law of evidence, should be careful not to open the door to falsehood, they should be equally careful not to shut out truth. They should not incumber the law with rules which will involve labor and expense to the parties, and delay the progress of the remedy — itself a serious evil — without giving any additional safeguard to the interests of justice. SWAYNE, J., 3 Wall. 141. But there is another circumstance which gives these documents weight, sufficient to entitle them to the consideration of the jury on the subject of marriage. The behavior of two persons of different sexes as husband and wife always affords an inference of greater or less strength that a marriage has been solemnized between

them.   Their conduct being susceptible of two opposite explanations, we are bound to assume it to be moral rather than immoral, and credit is to be given to their own assertions and acts, whether express or implied, of a fact peculiarly within their own knowledge.   We have this man and woman traveling together, surrounded with small children; their wearing apparel and bedding in the same trunks, and their initials on them.   These facts certainly indicate a very intimate relation, and one that would warrant the presumption of marriage on the principle above stated.   Charts of pedigree made by members of the family, or found among family documents, or hung up in family mansions, have been held admissible, even although without proof of their having been made by the directions of the family on the ground of their being acknowledged by the family.   Phillips' Ev., vol. 1, top page 212.

These documents reciting the birth of the children and the marriage of the decedent being found among his effects may be taken as a declaration by him of the legitimacy of the children, and of his own marriage, and on this ground the court below adjudged them admissible.   Before leaving this branch of the case it is proper to advert to the strictures made by counsel on the conduct of the judge, who, it appears, took upon himself the examination of Miller as to the time when the letters were received, and to the circumstances which led to the correspondence between Miller and Buger.   It is sufficient to say that the admissibility or non-admissibility of these letters in evidence was a question exclusively for the court.   It was the duty of the judge to advise himself fully as to all facts connected with them so that he might pass intelligently upon the question of admissibility, and I fail to see that the right with which the law clothes him has been abused or transcended.

It is further insisted by the appellant, that, conceding the death of Mrs. Buger, there is nothing in the evidence to show at what precise time she expired; that there is nothing in the evidence inconsistent with the theory that she survived her husband.   If she survived him for a moment

it is claimed that this action cannot be maintained. When two persons, husband and wife, are killed in the same accident, and there is no proof on the subject, the presumption of the law is that they died co-instantaneously. The right of action does not depend on the existence or non-existence of the wife. The existence of any legal representatives falling within the rules of the statute is sufficient. A more difficult question arises as to the true measure of damages; whether they shall be compensating and confined to the pecuniary loss sustained by the survivors, or shall go farther, and afford a salatium for the wounded feelings. When death is occasioned by gross negligence or willful misconduct, can punitive damages be recovered? On these subjects the statute itself is silent.

In England and New York, the courts have held that the damages are compensatory, but the statutes under which the decisions have been made are different from our own. In England, great stress is laid on the title of the act, which reads as follows: " An act for compensating the families of persons killed by an accident." The New York statute provides that " in every action the jury may give such damages as they shall deem a fair and just compensation, with reference to pecuniary injuries resulting from such death." The title to the statute on which this suit is brought is, " An act concerning damages." The body of the act prescribes no rule. From the careful examination I have given this subject, the conclusion seems clear that the legislature designed to confer on the personal representatives of a decedent, a right which was not enjoyed at common law. The latter part of the act fixes the order of distribution; all else is left to the operation of rules already in existence, for the admeasurement of damages. When a rule is prescribed in a statute, all other methods of computation must be ignored. When none is prescribed, then the statute must be taken to embrace those ordinarily applied to like cases. So far as I have examined, the authorities seem to be uniform in holding that, in actions brought by one to recover for injuries sustained through the negligence or misconduct

of another, mental anguish and suffering are legitimate subjects for compensation. The method of estimating them is difficult indeed, but they have been uniformly allowed. So, too, when the injury has been the result of wantonness, violence, or gross negligence, punitive damages have been awarded. I have been unable to find any solid reason which would preclude the application of these principles to a case brought by one who has survived his injuries. The fact that damages for mental anguish cannot be actually measured by a pecuniary standard, is entitled to consideration.

But the courts have never allowed this difficulty to prevail in actions of trespass or slander. In the latter case the insult offered, and the humiliation endured, are the ingredients that make up the basis of the assessment. Can this rule as to mental anguish, when the action is brought for the benefit of the survivors, be applied ? The subject is not free from difficulty. The personal representative is the trustee of an express trust created by the statute, and the children are the *cestuis que trust*. He is the mere instrument through which their rights are asserted, and his representative character cannot abridge or curtail the measure of damages which, under the law, they are entitled to recover. He is a mere nominal plaintiff, and the object of the law in allowing him to bring the action is to secure, in one suit, damages, which otherwise might require a multiplicity of actions. It seems to be settled that no damages can be recovered for the suffering which precedes the death. The grave bars out this right ; upon what known principle can the mental sufferings of the survivors be estimated. If the family is large, and the grief proportional to its size, then the damages would be immense. If the family was small, but the grief were boundless, how could it be compassed. How could a jury estimate the relative mental anguish of a widow and twelve children. Furthermore, it would involve a minute scrutiny into the personal relations of all parties. Affection would have to be measured by a graduated scale. An account would have to be taken of the familiarity which existed between the deceased and the survi-

vors. If a confirmed drunkard, or a person of vile associations, the grief at his departure might not be so poignant.

If the widow had wearied of her lord, or the husband of his wife, death might be a joy instead of an anguish. How determine the duration of this mental suffering, or the degree of its intensity? When a large number of survivors were found, an inquiry would have to be instituted into the feelings of each. This certainly might, in many instances, tend to scandal and disgrace. Neither the interests of the litigants nor the policy of the law could be subserved by such a course. None of these difficulties are encountered in estimating the mental suffering in the case of one suing for direct injuries to himself; his relations to others are in no sense material; it is a personal, not a relative, suffering.

It seems to me, therefore, that the survivors are not entitled to compensation for such anguish as they may have endured by reason of the taking off of their parent. What, then, is the measure of damages, and how shall they be estimated? It is extremely difficult to prescribe any satisfactory rule by which to measure the worth of a man's life. Human life has no market value. It will hardly do to limit the value of a man's life by his probable accumulations, for many men make none, and many have arrived at an age when they no longer attempt to make any. In making the estimate of the value of life and the consequent damage by death, much must be left to the sound discretion of the jury. They must take the facts in proof, and connecting them with their own knowledge and experience, which they are supposed to possess in common with the generality of mankind, arrive at a rule that will be comparatively just between the parties. They must place this money value upon the life of a fellow-being very much as they would upon his health or reputation. No fixed or definite measure has been prescribed by the legislature, and we are unable to advance one that would adapt itself wisely or justly to the various causes which now exist, or which are likely to arise. Deprivation of parental care and support, ability to accumulate, to maintain those left behind, the loss

of physical and mental culture that the parent would afford, are circumstances that must enter into the estimate. *Tilly v. H. R. R. Co.*, 29 N. Y. 284. Whatever is susceptible of pecuniary computation· enters into the rule, and what cannot be included must be left out. So, too, I apprehend, that when the injury is the result of wantonness, violence or gross negligence, it is competent for the jury to award punitive damages. *State v. Central R. R. Co.*, 60 Me. 492; *Penn. R. R. Co. v. Kelly*, 31 Penn. St. 378; *Penn. R. R. Co. v. Zebe*, 33 id. 328. The law governing the questions of gross negligence and punitive damages was fairly stated to the jury, provided the evidence warranted the instruction. The embankment was built some forty feet out into the bed of the stream. What efforts, if any, were made to ascertain the volume of water that was likely to flow in the channel, nowhere appears. Engineering skill certainly required that the locators of the bridge should have examined the character of the channel and the declivity of the circumjacent territory which forms the water-shed, to ascertain the quantity of water likely to pass. Some of the witnesses state that the channel was well defined for two or three miles; that it drained the waters from the divide, covering considerable scope of country. That no floods had theretofore recently happened cannot absolve the defendants, if any indications of high water existed at the time of location, showing that floods had occurred. Keating testifies that the material composing the embankment was poor, and that he informed the engineer that it would be liable to be washed out. Mooney swears that the soil was light and was affected by high winds. We cannot say that such material, carried out forty feet into the bed of a natural water-course, evinced the requisite degree of skill. The court instructed the jury that if, upon consideration of all the evidence, they were of the opinion that the defendant's employees, either at the time of the construction of the bridge or afterward, must have foreseen that such a flood as that which is said to have occurred would or might probably occur, and that the consequences

thereof might probably be the destruction of passing trains, then it was gross negligence not to provide against the casualty so foreseen as probably to occur; and in such case they would be warranted in allowing exemplary damages. They were cautioned to bear in mind, however, that exemplary damages could not be allowed for errors in judgment or for negligence merely, but that it must appear from the evidence that the defendant's engineers or employees were conscious such casualty and injury as complained of in this case might probably occur, and omitted to use the caution and effort which the law requires of them to prevent.

If any reliance is to be placed in the testimony of Burke, indications of high water were found in the immediate vicinity at the time the bridge was built, sufficient in character to call for the exercise of the highest prudence. There is another circumstance also entitled to weight. Coon creek afforded a drainage-way for the waters of the divide; Barrow testifies that it headed at the foot of the divide; in the afternoon preceding the accident, a heavy storm was observed at the head of Coon creek; the roaring of the water could be heard at Hugo. It seems to us that prudence enjoined upon the employees of the company an examination of the bridge after the storm and before the passage of trains. No such examination was made. The destructive character of such storms as this is a matter of common note, and experience teaches, and has taught, that storms along the divides in this country are not of unfrequent occurrence. There was, then, some evidence of gross negligence to be considered by the jury. Juries should, however, be careful in awarding punitive damages. The sympathies of fathers and brothers who compose them are always excited by the distressing circumstances attending such cases as this. Wild verdicts are returned, too often the product of passion instead of the result of calm and impartial judgment. The right to award them, however, exists in certain cases. If the right is abused, the courts will administer a corrective. Objection was taken to the admissibility of evidence showing that after the acci-

dent the company constructed a new bridge and afforded a larger space for the passage of water. The construction of the new bridge in a manner different from the old one is an admission that the first one was inadequate, but cannot be taken as an admission that its construction was attended with negligence. *Brehm* v. *Railroad*, 34 Barb. 276 ; *Westchester, etc., R. R. Co.* v. *McElwee*, 67 Penn. St. 314.

The evidence as to subsequent floods was, in the opinion of the majority of the court, improperly received. The instruction, however, cured the error. Another objection is taken to the question propounded to the witness Doll, as to whether any name was inscribed on the head-board of the buried man. Had the company fixed the name of Buger upon it, it would have been an admission that he was among the slain, and doubtless this was the ground for the inquiry. The objection is untenable.

There are some other minor and subsidiary objections, which it is not necessary to mention specially. It is claimed that the court committed a serious error in admitting the testimony of Burke; that this evidence was cumulative, and not rebuttal. The zeal with which the objection has been urged has led to a careful consideration of it, and to the conclusion that it is untenable. After the close of the case for the defendant, says Mr. Phillips, "The general rule is, that the evidence in reply must bear, directly or indirectly, upon the subject-matter of the defense, and ought not to consist of new matter disconnected with the defense and not tending to controvert or disprove it. This is the general rule, made for the purpose of preventing confusion, embarrassment and waste of time, but it rests entirely in the discretion of the court whether it ought to be strictly enforced or remitted, as he may think best for the discovery of truth and the administration of justice." Phillips' Ev., vol. 2, 912.

The evidence admitted was pertinent. It is not objected to because, from its nature, it cannot be heard, but because it was heard at an improper time. In matters of this kind, much is left to the discretion of the judge, and will rarely, if ever, be reviewed. *Williams* v. *Hays*, 20 N. Y. 58.

For the error in the measure of damages prescribed by the court the judgment must be reversed and the cause remanded ; and it is so ordered.

WELLS, J.   I dissent from so much of this opinion as declares that the benficiaries in the action are not to be compensated for their mental suffering.

HALLETT, C. J.   I concur in the result upon the ground that the court below erred as to the measure of damages. Upon other points discussed by the court I express no opinion.

*Reversed.*