PUBLIX CAB COMPANY, ET AL. *v.* COLORADO NATIONAL
BANK, ET AL.

No. 18,282.

COLORADO NATIONAL BANK, EXECUTOR, ETC., ET AL. *v.*
RUSSELL K. JENSEN.
(338 P. [2d] 702)

Decided April 13, 1959. Rehearing denied May 4, 1959.

205

206

Messrs. Kobey & Mitchell, for plaintiffs in error Publix Cab Company and Leo S. Miloff.

Messrs. Rice & Rice, for defendant in error Colorado National Bank in 18,251, plaintiff in error in 18,282.

Mr. C. E. Krohl, Mr. W. L. Peck, Mr. J. C. Street, for Colorado and Southern Railway Company.

Mr. John P. Beck, Mr. Robert H. Close, for defendant in error Russell K. Jensen.

*En Banc.*

Mr. Justice Doyle delivered the opinion of the Court.

The parties will be referred to herein as follows: Publix Cab Company as "Publix," Leo S. Miloff as "Miloff," The Colorado National Bank, as Executor of the Last Will and Testament of William H. Anderson, Deceased, as the "Bank," The Colorado and Southern Railway Company as the "Railway," The Colorado and Southern Railway Employees Hospital Association as the "Association," and Russell K. Jensen as "Jensen."

Publix and Miloff seek reversal of a judgment of the district court in favor of the Bank and the Railway. This is in No. 18,251. The Bank and the Railway seek a review and reversal of a judgment of the district court dismissing their claim against Jensen. The two causes have been consolidated, are based upon a common set of facts and will be determined in one opinion.

The personal injury which has given rise to the ac-

tions and judgments herein occurred on May 18, 1954, at 17th and Wazee Streets in Denver. The decedent, William H. Anderson, was a pedestrian attempting to cross Wazee Street in a Northerly direction on the West side of 17th Street when he was struck by a vehicle which was then being driven by Jensen and which in turn was hit by a Publix taxicab which was then being driven by Miloff. The taxicab hit the Jensen car at the right rear, spun it around and caused it to strike Anderson. Anderson sustained injuries which resulted in his immediate hospitalization and in his being in a coma from May 18, 1954, until his death on December 31, 1954.

The evidence established that the point of impact was 22 feet North of the South curb of Wazee Street and 14 feet East of the West curb of 17th Street, Jensen was proceeding in a Westerly direction on Wazee Street, Miloff was traveling South on 17th Street. Jensen's testimony was that as he was proceeding West on Wazee Street he stopped at the crosswalk of 17th Street. He waited for a car to pass coming from his left, looked to the right and proceeded across 17th Street. When he reached the middle of the street he saw a pedestrian step off the Southwest curb and he then applied his brakes. As he looked to the right a car was beyond the North crosswalk and was proceeding toward him. Although he tried to continue, his car was hit in the right rear and was swung through a 180 degree turn in the direction of the pedestrian. Jensen testified that when he got out of the car he found Anderson lying in the street. He said that he had not seen the cab and had not looked to the right after he had started up. He estimated his speed at about 10 miles per hour. Miloff's testimony agreed with that of Jensen in substantial particulars. His testimony as to speed was that he was traveling at 20 to 25 miles per hour. There was a factual dispute as to this point and expert testimony was offered based upon skid marks. This indicated that Miloff was traveling some-

what faster than he had testified. The expert, Lt. Roy Tangye, estimated his speed to be 31.966 miles per hour.

On September 16, 1954, the Bank, which was then acting as Conservator for Anderson, filed a personal injury action against Publix, Miloff and Jensen. Damages were demanded for temporary and permanent disability, pain and suffering, and hospital and medical expenses. Following the death of Anderson on December 31, 1954, an Amended and Supplemental Complaint was filed substituting the Bank as Executor in place of the Bank as Conservator and adding the Railway and the Association. On behalf of the Bank damages were claimed consisting of $800.00 paid as attorney's fees for services to the Conservator, $500.00 as attorney's fees paid in connection with the original personal injury action, $1500.00 paid as Conservator's fees and funeral and burial expenses in the amount of $927.34. The Association alleged that it had been obligated to furnish medical, surgical, hospital and nursing care to Anderson, an employee of the Railway, during his lifetime and that it had furnished these services to the extent of $11,026.77. It was further alleged that this amount would have been payable by Anderson had it not been for the obligation which required the Association to pay them; that by reason of this fact the Association was subrogated to the rights of Anderson and his estate. The Railway alleged that it had been required to pay $3,852.30 to the Association to reimburse it for a portion of the expenditures on account of hospital, medical, nursing, etc., expenses, and that it was by reason of this fact subrogated to the rights of Anderson and the Bank against Publix, Miloff and Jensen.

The answers of defendants alleged that the claims did not survive the death of the decedent under the "Survival Statute," C.R.S. '53, 152-1-9. At the trial it was established that the Association had paid (on account of medicine, hospital and nursing services) a total of $9,421.21, of which $1,992.50 was attributable to room

and board for Anderson. All this claim was assigned by the Association to the Railway.

It was also established that the estate of Anderson paid the Conservator $1500.00. This was allowed on February 3, 1955, after the death of Anderson. An allowance of $800.00 was made for attorney's fees for representing the Conservator in the administration of the estate and the amount of $500.00 for representing the Conservator in the original personal injury suit. Claims on account of burial were shown to have been allowed in the amount of $721.67 to the Olinger Mortuary, $80.50 to Watson Memorial Company and $125.00 to Fairmont Cemetery Association. These items were shown to have been paid by the Executor.

Following a trial to the court, judgment was entered in favor of the Bank in the amount of $3,727.24 and in favor of the Railway in the amount of $9,421.21.

The court's original judgment was later amended and supplanted by formal findings and conclusions and amended judgments. As to the judgment in favor of the Bank, it was found that the $800.00, $500.00, and $1500.00 items were paid in accordance with claims duly filed in the County Court in the Conservator's estate and that the sum of $927.34 for funeral and burial was also paid pursuant to a claim filed in the County Court and allowed by the court in the Executor's estate. It was also concluded that the estate and property of William H. Anderson was diminished by each of the amounts set forth.

As to the $9,421.21 for hospital and medical expenses, the findings were to the effect that these items were paid during the lifetime of William H. Anderson for his necessary medical care as a result of the injuries incurred and that the payments were made pursuant to the legal obligation of the Association and not as a voluntary act; that as a result thereof the Association became subrogated to the rights of plaintiffs against the defendants, Publix and Miloff, and that the Association

had assigned all of its rights to the Railway. Judgment was thereupon directed to be entered in favor of the Bank in the amount of $3,727.24 and in favor of the Railway in the amount of $9,421.21.

Anderson's widow asserted a claim for wrongful death against the defendants under the appropriate statute and settled this claim for $7500.00. As of the date of the death of Anderson the limit of recoveries was $10,000.00. In connection with that disposition, the widow disclaimed funeral and burial expenses as damages. No claim was filed against the estate of Anderson by either the Railway or the Association. All of this was stipulated at the trial.

The points which are relied upon by Publix and Miloff in 18,251 may be summarized and paraphrased as follows:

a. The action does not survive the death of Anderson.

b. The Railway does not have a right of subrogation.

c. Attorneys' fees, and food and lodging incident to hospitalization were not properly allowable (assuming that the action survived).

d. The expert testimony was incompetent since it was based upon a test which was inadmissible in evidence.

e. The negligence of Jensen was the proximate cause of the accident.

f. Funeral expenses were not recoverable independently where a wrongful death action has been prosecuted.

The point relied upon by the Bank and Railway in No. 18,282 is the alleged error of the court in dismissing their claim against Jensen.

1. *The Survival Question.*

As indicated above, the action here is by the executor of Anderson seeking damages which had accrued from the injury prior to the death of the decedent. These demands are distinct from those which had been made under the "wrongful death" statute, C.R.S. '53, 41-1-2. Where, as here, the defendant has injured another, but

has not caused his immediate death, and he later dies, two distinct actions exist. The executor may bring an action under the Survival Statute, C.R.S. '53, 152-1-9. The other action may be brought by the heirs under the Death Statute. This latter is what is commonly called Lord Campbell's Act, and is not here applicable. The present case is generally referred to as a survival claim.

Plaintiffs contend that the damages herein are recoverable on the theory that the estate of Anderson has been depleted by the expenditures in question. They argue that their claim is actually a property demand even though it stems from a personal injury — this by reason of the fact that it represents items of actual loss to the estate. They rely on the decision of this Court in *Kling v. Phayer,* 130 Colo. 159, 274 P. (2d) 97, wherein it was held that funeral expenses were recoverable separate and apart from any death claim as property damages. They have also patterned their demand after the decision in *Fish v. Liley,* 120 Colo. 156, 208 P. (2d) 930. The *Fish* case arose under the Death Statute and hence it does not help the plaintiffs. The holding there was that the wrongful death survived the death of the deceased tort feasor notwithstanding that the tort upon which it was based was a personal one; the action was not one which survived — that it was a new action for damages and that it was a property claim rather than a personal one, and consequently the exclusions of the Survival Statute did not apply to it. The *Kling* case, supra, held that this was also true of funeral expenses — that these constituted a property claim and could be asserted in a separate action. The difficulty with applying the *Fish* and *Kling* doctrines to the case at bar is that here the damages accrued *prior to the* death of the decedent. For this reason the medical, hospital and nursing expenses cannot be regarded as new property claims which are unaffected by the Survival Statute. These are recoverable only if they survive the death of Anderson. Of necessity, the executor stands in the "old shoes"

of the decedent and his right exists only if the Survival Statute authorizes its continued existence. This is due to the fact that at common law all injury actions died with the tort feasor or the victim of the tort. Statutes in all of the states have modified this rule. However, if it does not embrace the action, it is not possible to avoid the provisions of a survival statute by opening an estate and allowing claims. This expedient does not operate to transform personal damage items into property damages.

Since, therefore, the estate theory of recovery is not applicable, the remaining question is whether the action by the Bank and Railway is one which survives under C.R.S. '53, 152-1-9. This provides:

"All actions in law whatsoever, save and except actions for slander or libel, or trespass for injuries done to the person, and actions brought for the recovery of real estate, shall survive to and against executors, administrators and conservators."

The above provision was first enacted by the Territorial Assembly of 1868, Revised Statutes 1868, Section 154. The only change in the statute as originally enacted is the deletion of the words "on the case." These preceded the words "for slander or libel" in the original measure. The words "on the case" were dropped by the revisors of the 1953 statutes. Thus the 1868 version read:

"All actions in law whatsoever, save and except actions on the case for slander or libel, * * *."

In 1955 the section was amended to provide that *all* actions except slander and libel survive. 152-1-9, supra.

The ultimate question for determination is whether the term "trespass for injuries done to the person" as it appeared in the statute as it existed prior to the 1955 amendment operates to exclude an action like the instant one which is based upon negligence. The question whether damages for injuries which have accrued prior to death of a person injured as a result of the negligence

of another are recoverable by the executor of the estate of the decedent has not been determined in Colorado under the old statute. In a similar case, it has been held that such damages are recoverable where the executor sued in assumpsit, *Kelly v. Union Pacific R. R. Co.*, 16 Colo. 455, 27 P. 1058. The words of the statute have been construed in two Courts of Appeals decisions, and in several opinions of this Court, and these have held that negligence actions are trespasses and do not survive.

We are of the opinion, however, that the problem has not received full consideration in the previous decisions and that the importance of the question warrants re-examination. A brief consideration of the history of the non-survival rule as it existed at common law prior to the enactment will serve to shed some light on its historical meaning and on the meaning which is to be attributed to the words which were used in the Survival Statute when it was enacted by the Territorial Assembly in 1868.

At very early common law all actions died with the actors. This was true of invasions of property rights, real and personal as well as personal torts. This was expressed in the maxim *actio personalis moritur cum persona*. The origin of the rule and of the maxim is obscure. Goudy says, "Though this is one of the most familiar maxims of English law, the veil of obscurity covers not only its origin but its true significance." *Essays on Legal History*, p. 216. Most authorities agree, however, that it derived from the fact that the wrongs which later came to be represented by the writs of trespass had a criminal and later a quasi criminal origin. Holdsworth, *History of English Law*, Vol. 3, pp. 333-336, 576, 585; Pollock, Law of Torts, 12 Ed. 66-72. Prof. Winfield provides this description:

" * * * So it is not surprising to find in Fleta the writ of trespass as an alternative to appeals for mayhem, for blows, for imprisonment; and Britton regards this as the rule for every 'enormous trespass' for which an appeal

is possible; for the insensate risk of battle could thus be avoided. Now, as trespass had a strong quasi-criminal character, it is intelligible why no one at first thought there was anything unjust in the intransmissibility of the action for it. If one has the habit of looking upon a wrong as something very like a crime, it is a natural inference that none ought to be liable for it except the man who committed it." *Death as Affecting Liability in Tort,* 29 Columbia Law Review 239, 242.

Prosser adds this comment:

"Whatever the explanation, the rule became settled. Under Edward III it was somewhat altered by statutes which were construed to permit only actions for the loss, damage or conversion of personal property to survive to the executor or administrator of the plaintiff. These statutes did not cover torts against land, and made no provision for survival of the death of the defendant; and it was not until 1833 that these were covered by another English statute. The American courts took over the common law as it existed prior to 1833. They recognized the survival of actions for torts affecting personal property to the representative of a deceased plaintiff, but not as against the estate of the decedent, unless the estate was unjustly enriched by the tort so that the action could be maintained as one of quasi-contract restitution. * *. * " Prosser, *Law of Torts,* pp. 706, 707.

That the non-survival rule came into being because of the criminal character of trespasses and that it developed in connection with the serious intentional wrongs is further demonstrated by two year book cases which are reported in Winfield's article as follows:

" * * * Moreover, two other Year Book cases mentioned by the late Professor Goudy are significant. In Pasch. 19 Hen. VI, fol. 66, pl. 10, Newton, C.J.C.P., said, 'For the law is that, if a man do a trespass to me and die, the action is dead also, because it will be inconvenient to recover against one who was no party to the wrong.' Of the maxim he utters no word. So too, Fineux, C.J.K.B.,

in Mich. 12 Hen. VIII, fol. 11, pl. 3, said, 'This is outside the case where *actio moritur cum persona*, for that is where the hurt or damage is corporal, as if a man beat me and die, my action is gone, or if I die my executors shall not have an action, for the party cannot be punished when he is dead.' " 29 Columbia Law Review 245.

This same conclusion is to be drawn from the following comment of Blackstone.

"And in actions merely personal, arising ex delicto, for wrongs actually done or committed by the defendant, as trespass, battery, and slander, the rule is that actio personalis moritur cum persona; and it never shall be revived either by or against the executors or other representatives. For neither the executors of the plaintiff have received, nor those of the defendant have committed, in their own personal capacity, any manner of wrong or injury." *3 Blackstone Commentaries 302.*

Both the statute and case law in the United States was undoubtedly influenced to a great extent by this latter statement.

Although the common law rule as it had existed in England was changed somewhat by statute, the rule of non-survival of personal tort actions continued there almost unchanged until relatively recent times. In the United States, court decisions and statutes have changed the rule so drastically that at present little remains of it. Evans, *A Comparative Study of Survival of Tort Claims,* 29 Mich. L.R. 969.

This brief historical outline shows that the non-survival rule is a vestige of the ancient concept of violent torts, and owes its existence to historical accident and blind adherence to precedent. Moreover, it is apparent that its historical application was to violent and intentional torts — the quasi-criminal disturbances of the peace. It did not develop in connection with the type of tort here involved, based upon the negligence of the wrongdoer. As a matter of fact, the substantive tort action of *negligence* was not recognized until the nine-

teenth century. The rule based upon the maxim existed at earliest common law — the first modifying statute having been enacted in 1330. Prosser's text discusses the history of negligence and points out its recent origin.

"Negligence was scarcely recognized as a separate tort before the earlier part of the nineteenth century. * * *

"About the year 1825, negligence, emerging out of the action on the case, began to be recognized as a separate basis of tort liability. Its rise coincided in a marked degree with the industrial revolution. It probably was stimulated by the increased number of accidents caused by industrial machinery, and in particular by the invention of railways. It undoubtedly was greatly encouraged by the disintegration of the old forms of action, and the disappearance of the distinction between direct and indirect injuries, found in trespass and case. Intentional injuries, whether direct or indirect, began to be grouped as a distinct field of liability, and negligence remained as the basis for unintended torts. Today it is scarcely disputed that separate problems and principles, as well as distinct questions of policy, arise in negligence cases." Prosser, *Law of Torts,* 2d Ed. 116, 117. (Emphasis supplied.)

Thus it is manifest that the courts could not have been mindful of the action of negligence during the centuries that this rule was evolving.

In Winfield, *The History of Negligence in Torts,* 42 Law Quarterly Review 184, 195, is found the following:

"We have now reached the nineteenth century, and then the development of the conception of negligence as an independent tort is comparatively rapid. To fix dates is to invite instant criticism, but we are not far out if we select the period from about 1825 onwards as the most fruitful. Perhaps one of the chief agencies in the growth of the idea is industrial machinery. Early railway trains, in particular, were notable neither for speed nor for safety. They killed any object from a Minister of State to a wandering cow, and this naturally reacted

on the law. It is reflected in Petersdorff's 'Abridgement.'

* * *

"Where the reports between 1824 and 1840 give the declarations in the actions, they allege that the defendant so negligently, carelessly, unskilfully, and improperly did something or other that harm ensued to the plaintiff. All these words are not always included, but 'negligently' invariably is. True, the presence of so many synonyms goes to show that there is no distinction between them in the legal mind. But it is equally true that they cannot all be dismissed as mere adverbial abuse of the defendant. All of them except one may be that; but if the plaintiff had omitted them entirely he must have lost his action, for in every one of these cases the defendant's conduct would have been perfectly lawful but for his negligence, carelessness, lack of skill, or impropriety. A man did no wrong merely because he owned a cellar-flap, sailed a boat, drove a gig, kept a hayrack, or pulled down his own house. But when he did any of these things with insufficient advertence, which resulted in damage to another, he was liable; and this negligence was the gist of the action, and was the only thing in respect of which the action was sued. It was not simply a way of committing a tort; it *was* the tort. * * * "

▮ A circumstance which is as significant as the recent development of negligence is the change in remedies from trespass to case in negligence actions during the nineteenth century. This development is described in detail in *Winfield* in his article in 49 Law Quarterly Review 184, etc. Theretofore trespass had been the appropriate writ where the tort involved direct force regardless of whether the conduct of the defendant was intentional or negligent. With the development and recognition of negligence liability, the action on the case became the recognized remedy in the negligence action and the trespass action was limited to the intentional

torts of assault, assault and battery and false imprison-
ment. This transition is also described by *Prosser,* supra,
at pp. 27, 28 as follows:

"The procedural distinction between trespass and case
has long been antiquated, although some vestige of it
still survives in a few states which retain common law
pleading in a modified form. Modern law has almost
completely abandoned the artificial classification of in-
juries as direct and indirect, and looks instead to the in-
tent of the wrongdoer or to his negligence. The first step
was taken when the action on the case was extended to
include injuries which were not intended but were
merely negligent, and were inflicted indirectly. Because
of the greater convenience of the action, it came to be
used quite generally in all cases of negligence, while
trespass remained as the remedy for the greater number
of intentional wrongs. Terms such as battery, assault
and false imprisonment, which were varieties of tres-
pass, came to be associated with intent, and negligence
emerged as a separate tort. The shift was a gradual one,
and the courts seem to have been quite unconscious of
it. When, in the nineteenth century, the old forms of
action were replaced in most jurisdictions by the modern
code procedure, the new classification remained. There
is still some occasional confusion, and some talk of a
negligent 'assault and battery,' but in general these
terms are restricted to cases of intent."

In the year 1868 when the Colorado Survival Act was
adopted, the tort of negligence was well recognized and
the action on the case was the standard remedy. Perusal
of the early volumes of the Colorado Reports demon-
strates conclusively that the time had passed when all
injuries predicated upon negligence were embraced by
the writ of trespass. See, for example, the following
early negligence cases. *Kan. Pac. Railway Co. v. Miller,*
2 Colo. 442 (1874), *Kan. Pac. Railway Co. v. Lundin,* 3
Colo. 94 (1876), *Denver South Park & Pac. Railway Co.*
*v. Woodward,* 4 Colo. 1. A casual reading of these cases

shows that the tort of negligence as we now know it was fully recognized and it also discloses the action to be one on the case in every instance.

Turning now to the terms of our statute and specifically to its provision that "All actions whatsoever shall survive * * *," it is to be observed that its form indicates an intention to *create* remedies rather than to kill or suppress them. This view was taken in the early decision in *Kelley v. Union Pacific R. R. Co.*, 16 Colo. 455, 27 P. 1058. This was similar factually to the present case except that the action there was said to be in assumpsit. As to the statute's being remedial it was said:

"The maxim, '*Actio personalis moritur cum persona*,' is as old as the common law itself. Nevertheless, for more than five hundred years, or since the reign of Edward III., the rule has been the subject of legislative modification both in England and America. It would serve no useful purpose to attempt to trace the various changes of the ancient rule. The general rule which has prevailed for many years in this state is that actions of law do not die with the person; it is expressed in the following statute: * * * "

██ The specific words of the statute lend support to the thesis that the only injury actions which were intended not to survive were the traditional trespass actions, those which have now come to be considered as intentional torts. In view of the level of evolution of negligence and the action on the case as of the year 1868, it is not to be supposed that the Territorial Legislature of that year used the term "trespass" as meaning actions on the case as well. Why should the legislators have deliberately created an ambiguity when it would have been relatively easy to have expressly excluded it along with trespass. The omission of the words "actions on the case" or "actions in negligence" from the exception must be regarded as significant. Exclusion clauses in statutes are to be strictly construed. See 50 Am. Jur. 455, Sec. 434, Statutes, as follows:

"The specification by the legislature of exceptions to the operation of a general statute, does not necessarily operate to preclude the court from applying other exceptions. However, where express exceptions are made, the legal presumption is that the legislature did not intend to save other cases from the operation of the statute. In such case, the inference is a strong one that no other exceptions were intended, and the rule generally applied is that an exception in a statute amounts to an affirmation of the application of its provisions to all other cases not excepted, and excludes all other exceptions or the enlargement of exceptions made. Under this principle, where a general rule has been established by a statute with exceptions, the courts will not curtail the former, nor add to the latter, by implication. In this respect, it has been declared that the courts will not enter the legislative field and add to exceptions prescribed by statute."

If the statute is construed so as to exclude *all* personal injury actions, it is no more than a codification of the common law as it existed in England from 1330 to 1833, and it is not likely that this remedial statute was enacted so as to codify the law as it had existed in ancient times.

The Colorado statute seems to be a unique one, but it is noteworthy that early statutes in other jurisdictions (collected in note Ann. Cases 1914 D, p. 360) which declared that *all* personal injury actions did not survive specifically mentioned the action on the case for negligence. In *Jones v. Barmm,* 217 Ill. 381, 383, 75 N.E. 505, the Illinois statute then in force is quoted as follows:

" * * * In addition to the actions which survive by the common law, the following shall also survive: Actions of replevin, actions to recover damages for an injury to the person, (except slander and libel,) actions to recover damages for an injury to real or personal property, and actions against officers for misfeasance, malfeasance or

non-feasance, of themselves or their deputies, and all actions for fraud and deceit."

In that statute the words "actions to recover damages for an injury to the person" were used, and it would seem that our legislature could have used words of similar import had it intended to exclude the negligence action.

In *Scott v. Brown,* 24 Hunter 620 (New York 1881), the court held that a negligence action did not survive. The exception contained in the New York statute is set forth in the opinion which reads:

"But the preceding section shall not extend to actions for slander, for libel, or to actions on the case for injuries to the person of the plaintiff, or to the person of the testator or intestate of any executor or administrator."

Thus that statute, unlike our own, recognized specifically the distinction between "assault and battery and actions on the case." The court held that the words "actions on the case for injuries to the person" specifically included an action for negligence.

In *Stanley v. Vogel,* 9 Mo. App. 98, the court was called upon to construe a statute exactly like the New York statute and to hold that an injury action based on negligence was excluded. The Court said:

" * * * But the actions named in the next section, and the case for injuries to the person of the plaintiff, of which latter class this suit is an instance, are expressly excepted from the operation of the first section."

The New York and Missouri cases which are cited above reveal the existence of statutes in sharp contrast to ours, and the inference is clear that our legislature could have excluded specifically the negligence or trespass on the case action. Since it failed to do so, we should not supply the omission.

The fact that our original statute mentioned the words "actions on the case" and excluded only two types of such actions, namely, libel and slander, is an indication

that the Assembly had this particular writ in mind and intended that all other types of actions on the case should survive.

The rule's lack of logic and soundness (as a matter of social policy) is attested by the fact that it has been now repealed or modified by legislatures and courts throughout the United States, including Colorado.

■ The lack of historical validity of the rule that tort actions die with the person, and considering the rule's affinity to intentional torts only; and considering the state of the law at the time of the adoption of our statute and the unusual and limited scope of the exceptions set forth, we are of the opinion that the term "trespass for injuries done to the person" as used in C.R.S. '53, 152-1-9, prior to the 1955 amendment was limited to the traditional trespasses to the person, the intentional injuries of assault, battery and false imprisonment. It follows that personal injury actions based on negligence were embraced in the clause of the statute, "All actions whatsoever * * * shall survive."

The prior decisions in Colorado which have decided this question should be mentioned. For the most part they merely follow the rule previously announced in the definitive case.

*Kelley v. Union Pacific R. R. Co.,* supra, mentioned the problem but avoided deciding it:

" * * * It is unnecessary upon this review to decide the point thus presented. The complaint is in form *ex contractu;* * * * "

The definitive cases are two decisions of the Court of Appeals. The first of these and the one most frequently cited is *Letson v. Brown,* 11 Colo. App. 11, 52 P. 287. Here it was held that a negligence action did not survive against a deceased tort feasor. The Court laid down the broad rule which has been followed ever since that *all* personal injury actions died with the tort feasor. An unsuccessful attempt was made to distinguish *Kelley v. Union Pacific R. R. Co.* and actions like the case at bar

which are brought by the executor for depletion of the estate.

In *Mumford v. Wright,* 12 Colo. App. 214, 55 P. 744, the Court of Appeals went even further and declared that the statute had simply codified the common law. In *Clapp v. Williams,* 90 Colo. 13, 5 P. (2d) 872, the *Mumford rule* was followed in holding the tort of interference with contractual relations to be a personal injury and not an injury to property and hence did not survive. The same viewpoint was expounded in a malicious prosecution case in *Stanley v. Petherbridge,* 96 Colo. 293, 42 P. (2d) 609. The rule was also applied to malpractice in *Meffley v. Catterson,* 132 Colo. 222, 287 P. (2d) 45.

As we now view the above decisions, we are of the opinion that they do not give a fair interpretation to the Survival Statute. Instead, they have nullified it and have revived the common law rule of *actio personalis, etc.,* which the statute had sought to curtail. The pinpoint form of the statute warranted the ruling that it *was* intended to modify the common law and to declare that *all* actions survive except those excluded. Cf 28 Rocky Mountain Law Review 87.

Recent decisions of this Court have reflected a much broader philosophy. Thus, the *Fish v. Liley* ruling cannot be reconciled with the narrow viewpoint of the *Mumford v. Wright* rule, that "We go further, and hold that the words were intended to embrace and do embrace all actions for personal torts, * * * "

Since the liberal pronouncement in *Fish v. Liley,* supra, two other decisions which are in the same spirit have been announced. These are *Kling v. Phayer,* supra, and *Brown v. Stookey,* 134, Colo. 11, 298 P. (2d) 955.

It is with reluctance that we disapprove the decisions of the Court of Appeals in *Letson v. Brown,* supra, and in *Mumford v. Wright,* and that we overrule decisions in *Clapp v. Williams,* supra, *Stanley v. Petherbridge* and *Meffley v. Catterson* insofar as those decisions are in conflict with the present construction and interpretation

of the Survival Statute, C.R.S. '53, 152-1-9. These decisions are of long standing, and had they involved vested property or contract rights we would not, of course, have taken this step.

■ As a result of the conclusion which we have reached it follows that the action herein (being a claim based on negligence) survived the death of the decedent; that therefore the medical, nursing, hospital expenses and the other damages which had accrued during the lifetime of Anderson and which would have been recoverable by him had he lived are recoverable by the Bank as Executor of Anderson's estate.

2. *The Subrogation Question.*

The theory upon which the Railway contends that it is entitled to recover the medical, hospital, nursing, etc., expenses is this. It holds an assignment from the Association of all of its claim, and the Railway made a compensatory contribution to the Association by payment of the sum of $3,852.30 to the Association. Because of these facts, the contention is made that right of subrogation arose in the Association, and that the assignment effectively transfers the right to the Railway.

It was stipulated at the trial that neither the Association nor the Railway had made any claim against the estate of Anderson, and consequently the right, if any, of the Railway must be one which can be asserted *directly* against the defendants. Publix argues that the obligations of the Association and of the Railway under the Hospital Plan, Exhibit E, were primary contractual obligations running to the decedent by reason of his membership in the plan — that no right of subrogation is given in the contract and that consequently none exists. Subrogation by operation of law arises, they contend, only in those cases in which the subrogee pays the debt of another (which act does not extinguish the debt owed by the debtor to the person paying it).

Exhibit E describes a contributory employee hospital plan which is operated by the Association for the bene-

fit of C. & S. employees. Under its terms the employee pays into the fund one and one-half per cent of his monthly earnings. The Association undertakes to furnish medical and hospital service. A physician selected by the Association is furnished, and hospital service is also provided and this again is selected by the Association. The contract does not provide any right of subrogation — the only provision for reimbursement of the fund allows it to obtain a contribution from the Railway where the employee was injured while on duty.

The Railway concedes that traditionally the doctrine has been limited to "indemnity insurance, guaranty relations and the like," but contends that it is not limited to these situations. They add that "American Courts traditionally have been liberal in invoking the aid of subrogation to prevent an injustice, and they favor it where its application will aid in placing the burden of a situation on those who in equity and good conscience should bear it." Counsel quote and emphasize the following which appears in 50 Am. Jur. 686, Sec. 7, *Subrogation:*

" * * * As now applied, it is broad enough to include every instance in which one person, not acting as a mere volunteer or intruder, pays a debt for which another is primarily liable, and which in equity and good conscience should have been discharged by the latter. Its use to enforce restitution in order to prevent unjust enrichment has elsewhere been pointed out."

The doctrine which the Railway seeks to invoke, that of legal subrogation or subrogation by operation of law, is based entirely upon equitable considerations. There is nothing in the Articles and By-Laws of the Association, the governing contractor, which confers this right on the Association and there are no circumstances from which the right can be implied. This doctrine is applied as against a wrongdoer for the purpose of reimbursing the person who has been required to pay out as a result of the wrongdoing of another.

The Railway has cited three cases in support of their

position. These are *Fenly v. Revell,* 170 Kan. 705, 228 P. (2d) 905, *Potoczny v. Vallejo,* 170 Pa. 377, 85 Atl. (2d) 675, and *Geneva Construction Co. v. Martin Transfer,* 4 Ill. (2d) 273, 122 N.E. (2d) 540. In the *Fenly* case, the plaintiff contractor had been required to pay for damage to an oil rig which he had agreed to move. The damage resulted from the defendant sub-contractor's negligence. It was held that the plaintiff was subrogated to the right of the owner and could sue the sub-contractor for negligence. The *Potoczny* case is somewhat closer in its factual situation to the case at bar. There the City of Philadelphia was permitted to recover wages that it had paid to an employee during a period that he was unable to work as a result of the negligence of the defendant. The city's right to claim these wages was upheld. In the *Geneva* case the plaintiff employer was allowed to recover amounts which it had paid under the Workmen's Compensation Act to its injured employee from the tort feasor who had injured the employee. However, this Court has recently had occasion to consider a problem very similar to that which is present in the *Geneva* and *Potoczny* cases. This was in *Jacobson, et al. v. Doan,* and *Standard Accident Insurance Co.,* 136 Colo. 496, 319 P. (2d) 975, a Workmen's Compensation case in which the insuror sought to recover compensation which it had paid to Doan consisting of payments for hospital, medical and surgical expense. It was held that Standard was entitled to recover the amounts which it had paid for actual compensation and was not entitled to be subrogated with respect to the medical, hospital and surgical expense. The basis for the holding was that the statute authorized a recovery of compensation, but made no mention of benefits paid in behalf of an employee. The Court, speaking through Mr. Justice Hall, said (136 Colo. 509):

"The Workman's Compensation Law, C.R.S. '53, 81-13-8, provides the only authority for Standard's claim. Pertinent portions of the statute are as follows:

" '.* * * the awarding of *compensation* shall operate as and be an assignment of the cause of action against such other (defendants in this case) to * * * or insurance carrier liable for the payment of such *compensation*. Said insurance carrier shall not be entitled to recover any sum in excess of the *amount of compensation* for which said carrier is liable. * * * '

"Significantly, nothing is said about recovery back of benefits (hospital, medical and surgical expenses) paid in behalf of an injured employee. Further emphasis to the distinction between *benefits* and *compensation* is found in C.R.S. '53, 81-10-1 (providing for payment of medical, hospital and surgical *benefits*): 81-13-4 (providing for a 50% reduction in *compensation payments* in case of employee's violation of certain safety rules); 81-5-7 (providing for 50% increase in compensation in event of employer's failure to comply with insurance provisions of act).

"Standard, as statutory assignee, is entitled to recover only the amount of *compensation paid* and is not entitled to recover *benefits* (hospital, doctor and surgical expenses) paid. (All emphasis supplied.)"

Thus the principle to be inferred from this decision is that subrogation with respect to Workmen's Compensation payments is limited to that authorized by statute.

In any event, we are unable to perceive that the equities demand expansion of the subrogation principle in the instant case. Here the Association entered a contract with Anderson whereby he was entitled to the benefits in question in the event of the happening of the contingencies. Thus the Association was legally and primarily obligated to furnish these services to him in exchange for the payments which he had made. The indemnity feature which is found in the liability insurance case is not present. The situation here presented is almost identical with that which is found in the case of *Michigan Hospital Service v. Sharpe,* 339 Mich. 357, 63 N.W. (2d) 638, noted in 43 A.L.R. (2d) 1167. The Michi-

gan Court denied the right of subrogation as against the certificate holder and the wrongdoer. See also 29 Am. Jur. 1003, Sec. 1340. In the case at bar the Railway would not have had a right against Anderson or his estate.

 There is another factor which affects the equities of the Association and the Railway and that is our holding herein that the right to recover hospital and medical expenses belongs to the Bank as Executor. Thus the equities of the Railway are here opposed to the equities of the Executor, and not the equities of the wrongdoer, which often favors the party seeking to invoke the subrogation. A ruling in favor of subrogation in this case would undermine the principle that one who carries health and hospital insurance nevertheless has a right to recover these amounts from the wrongdoer. This is based upon the reasoning that such a policy is made between the insured and the insuror and does not mitigate the damages of the tort feasor. See 15 Am. Jur. 617, 618, Section 201, Damages, and see particularly the author's comment on pp. 618, 619 as follows:

"Of the same character as insurance money proper are the sick benefits and other aids received from benefit societies, fraternal societies, and other organizations of that class. Benefits received by the plaintiff from a source other than the defendant and to which he has not contributed are not to be considered in assessing the damages. The same has been held true of compensation received by an employee from a benefit fund maintained by the employer."

For all of these reasons, we conclude that the right of the Railway to invoke subrogation by operation of law must be denied.

3. *Attorney's Fees and Hospital Board and Lodging.*

Publix has objected specifically to the award of the attorney's fees incurred in the Conservator estate matter. This includes the fee paid by the Conservator for services rendered the estate and it also includes the fee

which was paid in connection with the commencement of this suit by the Conservator prior to the death of Anderson. The principle relied on is that in the absence of contract or statute there can be no recovery as damages of expenses of litigation and attorney's fees apart from the costs which are authorized. *Spencer v. Murphy,* 6 Colo. App. 453, 41 P. 841. See also *Jones v. First National Bank,* 74 Colo. 140, 219 P. 780, *Florence Oil & Refining Co. v. Hiawatha Oil, Gas & Refining* Co., 55 Colo. 378, 135 P. 454, and *Denver Council v. Shore,* 132 Colo. 187, 287 P. (2d) 267. The entire subject is considered in 25 C.J.S. 531, Sec. 50, Damages. The general rule is there expounded and the exceptions thereto are set forth. One of the exceptions permits the recovery of attorney's fees where the proximate consequence of the acts of the defendant has been involvement in litigation with others. The fee paid by the Conservator in connection with the administration of the estate does not appear to come within the mentioned exceptions or any other exceptions there described.

■ As to the fee that was paid in connection with the filing of the action, it is clear that Anderson would not have been able to have recovered this item and the Bank is limited to the elements which could have been asserted by Anderson had he lived.

Therefore, we conclude that the judgment for attorney's fees was not justified under the facts and circumstances here presented and this erroneous allowance must be set aside.

The contention that the food and lodging in connection with Anderson's hospitalization were not a proper element of damage must be rejected. The courts recognize the rule that this type of damage must be actual. However, we are not disposed to hold that such a distinction is valid in the case of *hospital* expenses. It is often impractical to separate board and lodging from hospital care and to say that the board and lodging is not recoverable because the injured party would have

had to live in any event. It can scarcely be argued that the injured person can obtain board and room in the hospital at the same cost that he would obtain it at home. Moreover, in the case at bar, it is important to note that Anderson was unconscious during his entire period of hospitalization until his death several months later. Assuming that board and lodging could be removed in some cases, it strikes us that it would be impractical and unjust to attempt to do it in the case at bar. The rulings in *Kellihan v. McHutt,* 70 Colo. 318, 201 P. 37, and in *Denver Tramway v. Kuttner,* 95 Colo. 312, 35 P. (2d) 852, do not commit this Court to a principle which is inconsistent with this present holding.

4. *Recovery of Funeral Expenses.*

We have previously indicated our viewpoint as to the right of the Bank to recover funeral expenses separate and apart from the death claim. This question is wholly governed by the case of *Kling v. Phayer,* supra, which was followed in *Rigot v. Conda,* 134 Colo. 375, 304 P. (2d) 629. We view this as a property claim which came into existence *after* the death of Anderson and it was proper to claim these expenses in an action other than the death claim. We are not called upon to determine whether funeral expenses are recoverable in addition to the amount which can be recovered in the death action inasmuch as the settlement of the death claim was in the amount of $7,500.00 whereas the limit was then $10,000.00, and thus the funeral expenses in the case at bar are within those limitations. Cf. *Dillon v. Sterling Rendering Works,* 106 Colo. 407, 106 P. (2d) 358.

We do not believe there is any merit in the contention that this claim must be asserted in the wrongful death action if such an action is filed or if such a claim is made and it is settled. There is not present any principle of irrevocable election which prevents the assertion of this demand in a separate action.

232

**5.** *Competency of Testimony of Witness Tangye.*

Publix urges that the trial court committed error in receiving in evidence an experiment which was made outside of court. This was part of the testimony of Lt. Roy Tangye of the Denver Police Department who was called by plaintiffs as an expert. As a foundation for his opinion, he described an experiment which he had made for the purpose of determining the coefficient of friction (as between the pavement and the tires) at the particular area. The physical facts had disclosed the existence at the scene of 46 feet of skid marks over-all. Tangye testified that he observed the pavement at 17th and Wazee and then searched out a similar surface (due to the fact that traffic conditions would not allow a test to be made at that place). He then made skidding tests in a vehicle of similar character and applied the coefficient of friction thus obtained to the 46 feet of skid marks which were present at the scene of the collision. Thereafter, he stated that in his opinion, disregarding the time lag in applying the brakes and disregarding the effect of the collision, the minimum speed of the vehicle was 31.966 miles per hour.

The contention of Publix is that it was error for the trial court to receive Tangye's conclusion based as it was on the experiment. Publix does not argue that Tangye was not shown to be qualified to give an opinion.

Our conclusion is that this ruling was not erroneous. The general rule is that experiments of this nature are admissible in evidence if they are made under conditions which are substantially similar to those which obtained on the occasion of the happening. *Kling. v. Denver*, decided February 24, 1959, 138 Colo. 567, 335 P. (2d) 876. It is also axiomatic that the trial judge may exercise discretion in determining the competency of such evidence and that his decision will not be disturbed absent a showing of abuse of discretion. See 8 A.L.R. 18 and 85 A.L.R. 480, 482. We are unable to conclude that

the trial court abused its discretion in receiving this evidence.

6. *The Dismissal of the Defendant Jensen.*

The Bank and Railway urge that the Court erred in its judgment of dismissal of the defendant, Russell K. Jensen. They argue that the evidence required a determination that Jensen was negligent as a matter of law.

It will be recalled that this collision and injury occurred at 17th and Wazee Streets in Denver. The Jensen vehicle was proceeding Westerly on Wazee Street. The taxicab had been proceeding in a Southerly direction on 17th Street. The pedestrian was crossing Wazee Street on the West side of 17th Street from South to North. Thus he was in a crosswalk which was outside the line of fire, so to speak, of the taxicab and would not have been struck had Jensen not driven into the intersection. The cab struck the rear of Jensen's vehicle causing it to turn in a 180 degree arc and to strike Anderson. Jensen's testimony was that he observed the stop sign before entering 17th Street and that he had adequate clearance when he started up. He failed to see the taxicab until just prior to the collision. It was then too late for him to escape. Plaintiffs rely on the violation of that ordinance which requires the driver of a vehicle entering a so-called stop street to yield the right of way to drivers who are traveling on those streets. The pertinent provision of this ordinance is as follows (Sec. 510.3-2, Exhibit C herein):

"3-2. The driver or operator of a vehicle or street car shall stop in obedience to a stop sign as required herein at an intersection where a stop sign is erected at one or more entrances thereto although not a part of a through highway and shall proceed cautiously yielding to vehicles or street cars not so obligated to stop which are within the intersection or approaching so closely as to constitute an immediate hazard, or to any other vehicle which has already stopped at another stop sign at such intersection."

In support of his contention that he is not shown by the undisputed facts to have been negligent, Jensen stresses the facts (a) that he observed the stop sign before entering the intersection, (b) that he looked to his right and according to the objective facts could have done so before entering the intersection, (c) that he was struck on the right rear fender, (d) that the forty-six feet over-all skid marks of Publix plus the heaviness of the impact (sufficient to drive Jensen through a 180 degree arc) corroborates his contention that Publix was going so fast that it was possible for him to have looked to the right and not perceived a hazard before starting up, and (e) the undisputed fact that he observed Anderson step off the curb and that he braked his car and hesitated.

We have concluded that there are facts in the record which justify the decision of the trier of the facts. While we recognize the relative inviolability of the stop or through street, we are not disposed to hold that there is a conclusive presumption that one who is struck while crossing such a favored street is negligent; acceptance of the thesis of Publix would require us to so conclude.

The Railway and Bank cite *Ridenour v. Diffee,* 133 Colo. 467, 297 P. (2d) 280, and *Werner v. Schrader,* 127 Colo. 523, 258 P. (2d) 766, as supporting their claim that Jensen was guilty of negligence as a matter of law. However, these involve failure to yield the right of way to the pedestrian, an ordinance which is not here involved.

Plaintiffs have not here established a violation of the quoted stop-street ordinance inasmuch as it is not shown that Jensen failed to stop at the entrance to 17th Street nor that he proceeded without what appeared to be adequate clearance. Since we do not hold that the happening of a collision raises a presumption that the person entering the stop-street is guilty of negligence, it must be concluded that the trial judge had before it sufficient evidence to justify the conclusion that Jensen was not guilty of negligence *per se* nor of common law

negligence. The district court could have accepted the facts which are emphasized by Jensen and from that concluded that Jensen acted prudently insofar as the injury of Anderson was concerned.

The decision in *Seifried v. Mosher*, 129 Colo. 156, 268 P. (2d) 411, is germane to the present analysis even though the pedestrian aspect was not there present. The trial resulted in a verdict for the plaintiff who had entered the highway after stopping and looking. This judgment was affirmed — the Court holding that it was not disposed to disturb the jury verdict notwithstanding that the weight of the evidence appeared to favor the defendant. The opinion observed that the Court did not feel justified in reversing a case simply because it would have decided it differently if it had been required to weigh the evidence. See also *Amos v. Remington Arms*, 117 Colo. 399, 188 P. (2d) 896, *McWilliams v. Bolster*, 120 Colo. 196, 207 P. (2d) 822. Cf. *Denver Equipment Co. v. Newell*, 115 Colo. 23, 169 P. (2d) 174.

The causes are reversed in the parts indicated, are affirmed in other respects and are remanded to the district court for further proceedings in accordance with the views herein expressed.

MR. JUSTICE SUTTON not participating.

MR. CHIEF JUSTICE KNAUSS concurs in the result.