KANSAS PACIFIC RAILWAY CO. *v.* LUNDIN, Administrator.

1. A railroad company is bound to use the highest care in constructing its road.
2. If the road be built of earth in the channel of a water-course, where it may be swept away by a great torrent of water, the company is negligent.
3. Having reference to all the conditions of climate and situation, and especially that provision was made for the water that would ordinarily flow in such water-course, the company was not willfully indifferent to consequences in so constructing its road.
4. Negligence alone is not to be visited with punitive damages. Willful misconduct, or that entire want of care which would raise the presumption of a conscious indifference to consequences, is necessary to support such damages.
5. The accumulations of the deceased during the remainder of his life, having reference to his age, occupation, habits, bodily health and ability, is the measure of compensatory damages under the statute in case of the death of an adult male.
6. For the purpose of showing the probable duration of the life of the deceased, the Carlisle, or other approved life tables, may be used.

*Appeal from District Court of Arapahoe County.*

LUNDIN, as administrator of John Sodonquest, brought an action on the case under the statute (act of 1872, page 117), for the use of the surviving father, mother, brother and sister of Sodonquest, against the Kansas Pacific Railway Company, for injuries occasioned by the alleged negligence of the railway company, resulting in the death of the intestate. The declaration alleges that Sodonquest was a passenger on one of the trains of defendant from Mirage, Colorado, to Denver; that by reason of unskillfulness, neglect and the imperfect construction of a bridge of the defendant, constructed over a water-course on the line of defendant's railway, between Hugo and Mirage, the car in which the intestate was a passenger was overturned; that the intestate was injured and then and there died. The survivorship of the relatives above mentioned was also alleged, and damages laid at $50,000. The plea of the general issue was interposed, and the cause tried at the September term,

1874, of the district court, resulting in a verdict for the plaintiff of $3,000.

A great deal of testimony was given at the trial to describe the place where the accident occurred, and the construction of the road at that point. The diagram below and the statement of the facts in the opinion contain all of this evidence that is necessary to fully understand the point decided. The embankment at the east end of the bridge, which was washed out, was called by the witness a "dump," and it is so marked on the diagram. All of the witnesses concurred in saying that this embankment was of light sandy soil, which would not resist water. It was about eight feet high and forty or fifty feet in length. It was built of the earth removed from the cut which is seen further to the right. This material was as good as any in the neighborhood, but there was nothing to hinder the company from extending the bridge the whole distance covered by the embankment. And this was done immediately after the accident. A vertical section of the bridge, the dump and the cut is also given, which may further illustrate the position of the road. A witness spoke of the father, mother, two brothers and a sister of deceased, as living in Sweden in the year 1867, and there were letters from the alleged father addressed to this witness, which tended to prove that he at all events was living at the time of the trial. It will be observed that the court was unwilling to say that this evidence was sufficient to show the alleged kinship between deceased and the persons for whose use the suit was brought.

The court charged that if the accident occurred through a defect in the roadway or bridge, there was *prima facie* evidence of negligence. As to the diligence and care demanded of the defendant in the construction of its road the following language was used :

"In the construction of their road-way the corporation is bound to use the highest care to procure and employ skillful and careful engineers, and these, in constructing and locating the road-way across any stream or water-way, are bound to use the same skill, care and circumspection, to

inform themselves of the nature of the stream and the amount of water which may reasonably be expected to flow therein, and to properly and safely locate and construct the road across such stream, as a man of the highest prudence, skillfulness and care would exercise in the like case.

They are bound to foresee not only the ordinary freshets usually occurring in the stream, but also such other freshets and floods as, though not usual, may, nevertheless, by the highest diligence and care in examination and inquiry, be anticipated, and then, so far as the highest degree of diligence and care will avail; to this, they are bound to so locate and construct the road-way as that it may not be endangered upon such occasions.

The corporation is not, however, bound to provide against such floods as are unprecedented, or that which cannot, by the degree of diligence above required of them, be foreseen."

Want of such care in the construction of the road was apparently regarded as ordinary negligence upon which the company would be liable for compensatory damages. And as to gross negligence and exemplary damages, the court charged as follows:

"If, however, you believe from the evidence that the defendant's engineer in charge of the construction of the bridge did in fact foresee that such a flood as that which is said to have occurred would or might probably occur, and that the bridge, as constructed, might probably go out, and yet, out of mere complacency to the convenience of it to the contractor Keating, permitted him to change the location of the bridge and construct a dump of unsafe and improper length at its eastern approach, then this was gross negligence, and in such case you will be warranted in allowing exemplary damages sufficient to punish the defendant for the gross negligence of its agents (which is its own negligence), and such damages should be proportioned to the degree of negligence as the same appears from the evidence

to have been exhibited by the defendant's employees, and all circumstances of aggravation or mitigation appearing in the evidence."

With reference to the measure of damages and the ground of plaintiff's recovery, the court charged as follows :

"The life of the son and his filial affection and attention is undoubtedly of some pecuniary value to the parent in all cases. It is upon this ground that the law allows the action in favor of the parent. In determining what that value was in the parent's instance, you should consider the evidence as to the relations between the parties prior to the son's death, and from the data given thereby you must deduce a rule which may seem to you to be just between these parties ; you are not, however, to award any thing for the suffering or pain, if any, experienced by the decedent, nor for the mental suffering of the father at his bereavement."

It appeared incidentally that deceased was a laborer, but the evidence was not directed to the matter of his probable earnings, his condition in life, etc., and the case was not put before the jury, in respect to damages, in the manner suggested in the opinion of the court. Other facts are sufficiently stated in the opinion. A great many points raised in the assignment of errors are not noticed by the court, and therefore no statement of them is necessary.

Messrs. SAYRE, WRIGHT & BUTLER, for appellant.

Mr. T. G. PUTNAM, for appellee.

HALLETT, C. J.   Briefly stated, the facts in this case, as given in evidence at the trial below, appear to be as follows :

In July, 1872, a violent rain storm occurred on the line of appellant's road, and produced a flood in a dry ravine or arroya, called Coon creek, which falls into Big Sandy creek. Thereby an embankment leading up to a bridge at the mouth of the arroya was washed out, and a midnight train, bearing appellee's intestate as a passenger, plunged

into the chasm, and the latter, with others, was killed. Negligence is not imputed to the persons in charge of the train, but the question is, whether the road was properly constructed at the place where the accident occurred. In describing the place, the witnesses speak of an old channel of the Sandy, which, with the space intervening between that channel and the new channel of that stream, formed a semi-circular basin, which was traversed by the railroad proceeding from east to west along the course of Sandy. Into this basin, on the north side of the railroad, the dry channel of Coon creek came, and the channel of Sandy, which was almost as dry as its tributary, was on the south side of the railroad and 150 to 200 feet distant from the latter. At bottom, the basin was somewhat unequal, but the old channel was quite level; according to some witnesses, it inclined slightly to the east, but not enough probably to affect very greatly the flow of water therein. In general elevation, it was several feet lower than the surrounding country, and but little higher than the bed of Sandy. A bridge 70 feet in length was located 40 or 50 feet from the east bank of the basin, apparently, to allow water discharged out of Coon creek to pass down to the new channel of Sandy. Connecting the bridge with the rim of the basin at the east, was the embankment which washed away, and which was made of earth taken from a cut which led up to the basin. The evidence was clear to the point, that the earth or sand used in the embankment would not resist the action of water, and of course, it was not adapted to the use which was made of it. The engineer in charge of the work, when the road was constructed, directed that the bridge should be located at or near the east bank, but afterward, upon a suggestion from the person who was grading the road, he allowed it to be placed further west. Indications of water having been in the channel, existed at the time the road was built, but it was not clear that any considerable volume of water had passed through the channel. One witness, who assisted in building the bridge,

gave some account of a flood which occurred while he was at work there, but he was not certain as to the locality; and from other testimony, it is probable that he was mistaken as to the place. However that fact may be, the witness was undoubtedly in that neighborhood and his testimony is of some value, as tending to prove that storms prevailed in that region of country at the time the road was built, and that the officers of the company knew or might have known that the road would suffer from great floods. Within knowledge of the people of the vicinage, no such storm as that which caused the disaster had occurred, nor had any such volume of water been seen in the channel of Coon creek. On the night in question, it was probably five feet deep and it flowed with a rapid current.

Upon these facts, a principal question presented in the record is, whether the road at the point where the accident occurred was properly constructed to resist the action of the elements upon it. That the company was bound to exercise the highest degree of care in that respect is conceded, and if the officers of the company knew, or could have ascertained by diligent inquiry, the danger to which the road was exposed, they were bound to guard against it. This is the principle founded upon public policy which was recognized by this court in a case which grew out of the same accident (2 Col. 442), and it is supported by unquestionable authority. Floods of the volume and violence of which destroyed the road, although infrequent, were not unknown on the plains, and in the region of country where the accident occurred. One witness had some knowledge of six storms of much the same character within the Territory, and another gave an account of one which occurred near the scene of the disaster at the time when the road was built. Aside from this, the fact that such storms have visited different localities, and their destructive power is part of the history of the country, of which we are justified in taking some notice; it is true, that this peculiarity of the climate was not as well known

in the year 1870, when the road was built, as it is at present, but it was then sufficiently known to demand the attention of the company.

It is true also, as the evidence shows, that these storms are erratic, rarely recurring in the same place and usually confined to a small territory. That circumstance may be sufficient to relieve a railroad company from the imputation of negligence which might be inferred from a failure to provide a sufficient water-way in places where there is no natural channel, and nothing in the topography of the country to suggest danger from water. We shall presently show that the same circumstance will often rebut a presumption of willful misconduct in constructing the road, but it cannot avail to relieve a company from the duty of providing sufficient water-ways in places where, as in the case at bar, there is a natural channel which drains a considerable territory. Experience proves that in such places large bodies of water may accumulate, and although this does not often occur, the safety of the traveling public demands that ample provision shall be made for it.

Referring to the evidence in this case, it is only necessary to say in this connection that the embankment which was washed away was manifestly inadequate to withstand a large body of water, as the catastrophe which gave rise to this suit sadly proved; and the company was negligent in placing it there. The case of *Withers* v. *The North Kent Ry. Co.*, 3 H. & N. 969, in which, upon facts somewhat analogous, the company was discharged, is not controlling, for in that case negligence was not shown. In a humid climate it may not be necessary to guard against such torrents as that which swept over appellant's road, but with us the necessity exists, and railroad companies should recognize it.

To these general remarks touching the liability of the company, something should be added upon the question of exemplary damages which was submitted to the jury. Of the right to such damages under the statute (9 Sess.

117) it is enough to say that it was recognized in *Kansas Pacific Railway Co. v. Miller*, 2 Col. 442. But the application of the rule to cases of this kind must be with the limitations which obtain in other cases, and upon that point we have a valuable opinion from the supreme court of the United States. In *Milwaukee & St. Paul Railway Co. v. Arms*, 1 Otto, 489, degrees of negligence upon which so much learning has been expended are entirely discarded, and it is said that negligence alone is not to be visited with punitive damages; Willful misconduct or that entire want of care which would raise the presumption of a conscious indifference to consequences, is necessary to support a claim for such damages. Upon looking into this record we are unable to see that such misconduct or want of care in the construction of appellant's road was shown. The seventy foot bridge was shown to be sufficient to admit of the passage of all water that would in the ordinary course of nature flow down the arroya, and in view of all the evidence the fact that the location of it was changed when the road was in process of construction is not particularly significant. The channel at that point was nearly level from side to side and a projecting bank, a short distance above, afforded some protection to the eastern embankment. One engineer, who, was not in the company's service, thought that the western embankment was in more danger from water than the eastern. It seems that for the water which might be expected to flow in that channel after ordinary rain storms (for at other times it had none), the bridge was as well located as it would have been if placed nearer the eastern rim of the basin.

And as to the flood which destroyed the road, the officers of the company had no greater reason to apprehend that it would fall in that place than elsewhere on their long line. True, there were indications of the action of water, but probably no greater than in many other valleys on the road, and certainly not sufficient to indicate that such torrents were of common occurrence there.

The law of these phenomena is little understood, and no one can say that a deluge will happen here or there, although there is some reason to expect it everywhere. The fault of the officers of the company appears to have been that they did not study the course of nature, and guard against her casual and fortuitous outbursts, rather than a willful and reckless disregard of duty. In this we have said there was negligence, but there was not willful misconduct, or that want of care which, in the presence of a known danger, is indifferent to consequences.

Cases may arise, presenting other features, as for instance—if no water-way should be provided in a place where one was manifestly needed, in which a different rule would be enforced, but upon the evidence in this record, we think there was no ground for punitive damages.

We come now to consider the true measure of compensatory damages in cases of this kind, a subject of great difficulty, upon which widely different opinions have been expressed. Whether the damages given by the statute are for the injury to the deceased, and such as he might have recovered, if he had lived, or for the loss sustained by the survivors in and by his death, is not entirely clear to the writer. But regarding the point as settled in favor of the latter proposition, by the decision of this court, to which reference has been made, and perhaps by the weight of authority also, there is still some difficulty in ascertaining the loss of the survivors. In many of the decisions the value of the life of the deceased is mentioned, and language of that kind is used in Miller's case, but this certainly does not mean the value of life in the abstract, for in that sense it would be simply incalculable. As a matter of sentiment, life has no pecuniary value, but considered with reference to the relations of deceased with others, it is capable of such estimate. In this sense a parent is entitled to the services of children during their minority, and to support and maintenance from them in his declining years; a husband is entitled to the assistance of his wife in the af-

fairs of life, and a wife is entitled to support from her husband; children may demand nurture and education from parents, and all these services may be compensated in some sort and degree by money. It is in this sense, with reference to the probable benefits that would have been derived by survivors from the life of the deceased, if he had lived, that the phrase should be understood in the law, for otherwise all will be left to the discretion of the jury. *Pennsylvania Railroad Co.* v. *Butler*, 57 Penn. St. 335. So understood there seems to be some doubt whether the recovery should be according to the needs of the survivors, and what they would have been entitled to demand from deceased if he had lived, or the probable accumulations of the latter to be appropriated to the use of the survivors. In a Georgia case a widow was allowed the present worth of a reasonable support for herself, according to the expectation of the husband's life in view of his condition and circumstances; and so also in Maryland. *Macon and Western R. R. Co.* v. *Johnson*, 38 Ga. 409 ; *B. & O. R. R. Co.* v. *State*, 33 Md. 542. So in California, it was held upon rehearing, contrary to the opinion first announced in the same case, that surviving children, however numerous, were entitled to support and education during minority, and this was the extent of the defendant's liability. *Taylor* v. *Western Pacific R. R. Co.*, 45 Cal. 332. The opposite view is maintained in North Carolina. *Kessler* v. *Smith*, 66 N. C. 154. And in the case before cited from 57 Penn., it is said that the loss is what the deceased would have probably earned, by his intellectual or bodily labor in his business or profession, during the residue of his life-time, and which would have gone for the benefit of his children, taking into consideration his age, ability and disposition to labor, and his habits of living and expenditure. The same rule has been adopted in Iowa. *Rose* v. *Des Moines Valley Ry. Co.*, 39 Iowa, 247. And in Illinois, apparently with the qualification that nothing shall be allowed, if the survivors were not in any degree dependent upon deceased for

support.    *Chicago & Acton R. R. Co.* v. *Shannon*, 43 Ill. 339.

The authorities are, however, quite bewildering, and to review them at length would be very tiresome.    The rule which gives to survivors the probable earnings of the deceased, if his life had not been cut off, is strongly supported by the consideration that it is of uniform operation and effect.    Under it the recovery is the same under like circumstances, whether the beneficiary is husband, wife, child or parent, and no reason is perceived why it should not be so. This accords with what is said in *Illinois Central R. R. Co.* v. *Barron*, 5 Wall. 104, as to the theory of these acts; and it seems to be the better rule.    Strong objections may be urged against it, but I do not perceive that any other rule is more defensible.    Upon this it would seem that the view taken of the statute in the court below was incorrect. The jury should not have been required to return damages according to the filial affection and attention of deceased to his parents, for of these no pecuniary estimate could be made.    The statute does not stand upon that idea, but upon the theory, that in old age, parents may rely upon children for support, in the same way as children demand the like care in infancy from their parents.    The accumulations of the deceased, during the remainder of his life, having reference to his age, occupation, habits, bodily health and ability, would have furnished the true measure of compensatory damages.    This is not applicable to all cases, as for instance, in the case of a child of tender years, it is not possible to show more than the age and sex, and the circumstances and condition in life of the parents.    *Ihl* v. *Forty-Second Street R. R. Co.*, 47 N. Y. 318 ; *Pennsylvania R. R. Co.* v. *Keller*, 67 Penn. St. 305.    So in the case of a wife, other data must be used, but the rule suggested seems to be applicable to adult males.

For the purpose of showing the probable duration of life, the Carlisle, or other approved tables may be used.    *Rowley* v. *London & N. W. Ry. Co.*, 8 Exch. L. R. (1872-3)

221; *Donaldson* v. *Mississippi & Missouri R. R.*, 18 Iowa, 290.

If the views here expressed do not fully accord with what is said in Miller's case, it is thought necessary to modify that opinion. The evidence was stronger in that case, however, and probably we have not overruled it in any substantial point.

Several questions relating to the admissibility of testimony have been examined, but any discussion of them would be unprofitable. Without deciding whether the evidence at the trial was sufficient to prove the parentage of deceased, we think that more should have been offered. Doubtless, evidence to show that the alleged parents of deceased acknowledged the marital relation, and lived together as husband and wife, could have been obtained, and this should have been done.

The judgment of the district court is reversed with costs, and the cause remanded.

*Judgment reversed.*