No. 19,691.

FRED HERBERTSON AND ROBERT HEBERTSON, D/B/A HERBTSON SAND AND GRAVEL COMPANY, *v.* AMOS RUSSELL, ET AL.
(371 P. [2d] 422)

Decided May 7, 1962. Rehearing denied May 28, 1962.

Messrs. GORSUCH, KIRGIS, CAMPBELL, WALKER & GROVER, Mr. JOHN L. FERGUSON, for plaintiffs in error.

Mr. MARTIN P. MILLER, Mr. WILLIAM S. HART, for defendant in error.

*En Banc.*

MR. JUSTICE MCWILLIAMS delivered the opinion of the Court.

In a trial to the court judgment was entered for Amos and Eva Russell against Fred and Robert Herbertson, doing business as Herbertson Sand and Gravel Company and hereinafter referred to as defendant or Herbertson, in the amount of $25,000 for the wrongful and negligent death of their minor daughter, Glenda Sue Russell. By writ of error Herbertson seeks reversal of the judgment, contending: (1) that their agent, one Barksdale, was not negligent; (2) but that if he was in fact negligent, such was not the proximate cause of Glenda Sue's death; (3)

that in reality the proximate cause of Glenda Sue's death was her own act of running into and in front of the left rear wheel of the Herbertson truck; and (4) that the award of $25,000 was so grossly excessive that as a matter of law it must be set aside.

We conclude that the trial court committed no error when as the trier of the facts it determined that Herbertson was liable to respond in money damages to the Russells, but that the court did err when it fixed the monetary damages of the Russells at $25,000. Accordingly, the judgment is reversed and the cause remanded for a new trial on the issue of damages only.

This tragedy occurred at about 11 o'clock A.M. on August 2, 1959, in Arapahoe County, at the intersection of West Hampden Avenue and South Bryant Street. West Hampden Avenue runs east and west, with South Bryant Street running north and south. These two roadways intersect at right angles and in so doing form a "T" intersection, i.e. South Bryant "dead ends" at Hampden and only runs north from Hampden.

One Barksdale was a truck driver for Herbertson, and at the time and place of this fatality was admittedly about his master's business. More specifically, Barksdale was driving a Herbertson-owned truck, partially filled with pit run gravel, in an easterly direction on Hampden Avenue, approaching the intersection of that avenue and South Bryant Street.

Glenda Sue, age 6, was running in a southerly direction on the east side of South Bryant Street. She apparently saw a car approaching this intersection from the east, and when this car slowed and eventually stopped she ran into the intersection and into and in front of the left rear wheels of the Herbertson truck.

Barksdale testified that he never saw Glenda Sue until she was even with the cab of the truck, and that though he applied his brakes it was by then too late to avoid the accident. A pivotal factual dispute was whether Barksdale was to the right of the center line of Hampden

Avenue or, on the contrary, was astraddle of the center line so that his left wheels were some two or three feet on the "wrong" side of the road. Barksdale insisted that he was entirely on the "right" side of the avenue. A disinterested witness who was driving in a westerly direction on Hampden Avenue testified that Barksdale was entirely in the proper lane for eastbound travel, and was not "over" the center line of that street. It was this witness who said she saw Glenda Sue running in a southerly direction along the east side of South Bryant Street and therefore stopped her vehicle, whereupon Glenda Sue ran into the crosswalk area past the front end of her vehicle and into the side of the Herbertson truck.

Two police officers who investigated the accident found 37 feet of heavy skid marks several feet *north* of the center line of Hampden Avenue, and both stated that from their investigation they concluded that these skid marks were laid down by the Herbertson truck. Also they testified that they found blood, hair and human matter at or very near to these skid marks. The net effect of this testimony, if believed, would tend to establish that the truck was astraddle the center line of Hampden Avenue and not entirely to the south of the center line.

On this state of the record the trial court found that Barksdale was negligent in that a portion of his truck was on the "wrong" side of the street and further that under all the facts and circumstances of the case Barksdale failed to exercise due care, and that his negligence was a proximate cause of the ensuing accident. Additionally, the trial court found that Glenda Sue's conduct was consonant with that of a reasonably prudent 6 year old child and that she was not contributorily negligent.

Herbertson contends that the trial court erred in finding that Barksdale was negligent, and that such was a proximate cause of Glenda Sue's death. Recognizing that

because of her age it was most difficult to make out a case of contributory negligence against Glenda Sue, Herbertson argues that Glenda Sue's *act* of running across Hampden Avenue was *the* proximate cause of her death, regardless of whether the act be deemed negligent or not.

In our view of the matter the trial court committed no error in imposing liability on Herbertson. The issues of primary negligence, contributory negligence and proximate causation were clearly disputed issues of fact, and no citation of authority is deemed necessary in support of the oft-repeated pronouncement that findings of fact made by the trier of the facts will not be disturbed on review if supported by credible testimony.

Certainly there is competent and credible evidence to support the finding that Barksdale at the very least was astraddle of the center line of Hampden, and that this negligent act was at least *a* proximate cause of the fatality. Also, the trial court was obviously impressed by the fact that the disinterested witness traveling west on Hampden saw this child and stopped her vehicle, whereas Barksdale who had an even clearer view of the intersection and claimed to be maintaining a sharp lookout did not see the child until only a split second before the impact. In short, there is ample evidence in the record to support the finding of the trial court that Herbertson's agent was negligent, that such was a proximate cause of Glenda Sue's death and that Glenda Sue was herself without negligence. This being the case, these findings should not be distrubed by us on review.

In their complaint the Russells alleged "that as a result of the unlawful and negligent act of the defendant's agent, the plaintiffs were denied the right to the earnings of Glenda Sue during her minority and further denied the right to look to her for assistance in their declining years." Accordingly, the Russells prayed for judgment in the amount of $50,000, claiming that the statutory limit of $25,000 was "a deliberate violation of

the Colorado Constitution and the Federal Constitution." The trial court entered judgment for $25,000. The Russells assign no error to the award made by the trial judge, hence the contention that the statutory $25,000 limitation is unconstitutional is not properly before us.

Careful analysis of the meager and very sketchy testimony bearing on the issue of damages convinces us that the award of $25,000 was grossly excessive and under well established principles cannot be permitted to stand.

Amos and Eva Russell, the natural and surviving parents of Glenda Sue, were respectively 42 and 41 years of age as of the date of trial. They maintained their family home in Athens, Tennessee, where Amos had seasonal employment with a sawmill and his average annual earnings were $600 to $700. Eva, who was not in the best of health, had no outside employment, her full time being occupied in running the Russell household. The Russells had eleven children, two of whom died during childbirth, and following Glenda Sue's unfortunate death eight living children remained. The four oldest children were all girls, and each had married at about the age of sixteen. The Russells testified that on occasion these four had made some financial contribution to them, but they were unable to give exact figures as to amounts, with one exception where a daughter had given them $200, which sum was apparently used to get the Russells to Colorado for the trial.

Glenda Sue was described as a more-or-less typical six year old child, in apparent good health, and she was said to be both dutiful and loving in her relationship with her parents. At the time of the accident she was "staying," if not indeed living, with an aunt and uncle who resided on South Bryant Street. The Russells indicated that because of their large family and meager income Glenda Sue had spent almost two years of her life with relatives, away from the family home, and for almost one year immediately prior to August 2, 1959 had apparently been with her aunt and uncle in Colorado.

On this state of the record the trial court specifically noted that it was "difficult to fairly assess the value of a human life — in fact impossible," but after this candid confession proceeded with no hesitation and little explanation to enter judgment for the Russells in the amount of $25,000. This was error.

■ Colorado has long held to the rule that the damages to be awarded in a wrongful death case are compensatory only, and not exemplary in the sense that they are imposed as a penalty against the wrongdoer. Nor are they a solatium for the grief of the living occasioned by the death of their relative, "however dear."

■ In *Pierce v. Conners*, 20 Colo. 178, 37 Pac. 721 it was held: "The true measure of compensatory relief in an action of this kind, under the act of 1877, supra, is a sum equal to the net pecuniary benefit which plaintiff might reasonably have expected to receive from the deceased in case his life had not been terminated by the wrongful act, neglect or default of the defendant. Such sum will depend on a variety of circumstances and further contingencies, and will, therefore, be difficult of exact ascertainment; but the damages to be awarded in each case may be approximated by considering the age, health, condition of life, habits of industry or otherwise, ability to earn money, on the part of the deceased, including his or her disposition to aid or assist the plaintiff; not only the kinship or legal relation between the deceased and the plaintiff, but the actual relations between them as manifested by acts of pecuniary assistance rendered by the deceased to the plaintiff, and also contrary acts may be taken into consideration. But it must be borne in mind that the recovery allowable is in no sense a *solatium* for the grief of the living occasioned by the death of the relative or friend, however dear. It is only for the pecuniary loss resulting to the living party entitled to sue resulting from the death of the deceased that the statute affords compensation. This may seem cold and mercenary, but it is unquestionably the law."

"Net pecuniary loss" has been construed so as to include not only the loss to the parent of the services and earnings which they could have reasonably expected from their child during his or her minority, less their expenditures for his or her maintenance, but also includes the loss of services and support which they could have reasonably anticipated during their "declining years," but for the untimely death. See *Kansas & Pacific Railway Co. v. Lundin, Adm.* 3 Colo. 94 and *St. Luke's Hospital Association v. Long,* 125 Colo. 25, 240 P. (2d) 917.

█ Granted that damages in a wrongful death case need not and generally cannot be proven with mathematical certainty, still there must be some evidence to prima facie establish with at least a reasonable degree of certainty the damages flowing from the wrongful death. In the instant case we are reluctantly, but inexorably, forced to the conclusion that the evidence pertaining to damage is legally insufficient to support the monetary award of $25,000.

█ The suggestion that this Court should depart from its prior pronouncements defining the measure of damages recoverable under our wrongful death statute would do utter violence to the well-established rule of statutory construction that when a legislature repeatedly re-enacts a statute which has theretofore received a settled judicial construction, there can be no doubt as to the legislative intent, and in such circumstances it must be considered that the particular statute is re-enacted with the understanding that there be adherence by the judiciary to its former construction. See *Harvey, et al., v. Travelers Insurance Co.,* 18 Colo. 354, 32 Pac. 935; *Lyons, Administratrix, v. Egan,* 110 Colo. 227, 132 P. (2d) 794; and *School District No. 1 of Arapahoe County v. Hastings,* 122 Colo. 1, 220 P. (2d) 361. Nor are we impressed with the further suggestion that our prior decisions on this point are "unconstitutional." It should never be forgotten or overlooked that at the common law there was no

action for wrongful death, as such, and but for our wrongful death statute the Russells would have no claim against Herbertson for the wrongful death of their child.

Accordingly, the judgment is affirmed as to the liability of defendants, and reversed on the matter of damages, and the cause remanded for a new trial on the issues of damages only.

Mr. Justice Frantz specially concurs.

Mr. Justice Moore and Mr. Justice Pringle dissent.

Mr. Justice Frantz specially concurring:

I, too, vote for a reversal of this case, but, in doing so, I cannot accept the reasoning of the majority opinion. Indeed, I am opposed to the doctrine of damages enunciated in the majority opinion, and I would from this day forward write "finis" to such doctrine as being a debasing and melancholy chapter in the jurisprudence of this state. I refer to the doctrine of damages judicially declared to be allowable in wrongful death actions.

Since the case of *Pierce v. Conners,* 20 Colo. 178, 37 Pac. 721, 46 Am.S.R. 279, this court has construed C.R.S. '53, 41-1-3, as amended, in a truly constricted sense. Beyond cavil this court in so doing amended the statute; it gave an astringent construction to the words of the statute permitting the award of "such damages as [the jury] may deem fair and just * * * with reference to the necessary injury resulting from such death, to the surviving parties, who may be entitled to sue. . . ." The court, in *Pierce v. Conners,* shrunk the quoted words to a meaning of "pecuniary loss" to the persons entitled to sue.

Compression of the statute was further achieved by giving a narrow and very particular meaning to the words "pecuniary loss." In effect, these words meant a loss of the benefit of the decedent's earnings less any ex-

penses, and, as applied to a very young child, his earnings would probably be practically nil while the expenses of his care, upkeep, and education would be great. Thus, the court substituted the words "pecuniary loss" for the damages recoverable under the statute, and then defined "pecuniary loss" as if the heart of the law was all stone and no flesh.

As a matter of cold fact, parents who lose a six-year-old daughter sustain no such pecuniary loss; in fact, they are in a very practical and materialistic sense relieved of a burden. Our present way of life being such as it is, in which child labor is generally forbidden, in which we have compulsory education, and in which the education of a child to the age of 20 years is not unusual, the snuffing out of a child's life through fault disburdens the parents in a very realistic sense, of expensive obligations, rather than bringing about any pecuniary loss to them.

The wrongful death statute has been re-enacted several times, but only to increase the amount recoverable. Unfortunately, under the well-recognized rule, the re-enactments carried with them the interpretation previously given them by this court. If prior interpretation had not been given, we would be in a position now to give the very general, broad terms of the wrongful death statute a meaning consonant with the Constitution of this state. But we are confronted with a stricture on language which makes the wrongful death act unconstitutional, in my opinion, if the former interpretation is adhered to.

Should we cling to a court-imposed construction which, upon consideration, appears to circumvent constitutional rights? Courts, including this one, have discarded a prior interpretation of an act when it was made to appear that such interpretation ran counter to fundamental law. In *People ex rel. v. Mountain States Tel. & Tel. Co.,* 125 Colo. 167, 243 P. (2d) 397, this court overturned a line of decisions which had recognized rate-making of public utilities to be local and municipal

matters in home-rule cities under the 20th Amendment. Even a construction of the Constitution itself, previously made, was declined further recognition in *People ex rel. v. Cassiday*, 50 Colo. 503, 117 Pac. 357, the court quoting Justice Field that "[i]t is more important that the court should be right on later and more elaborate consideration of the cases than consistent with previous declarations."

Justice Fuller of the Supreme Court, in the case of *Pollock v. Farmers Loan & Trust Co.*, 157 U.S. 429, 15 S.Ct. 673, 39 L.Ed. 759, declared that the duty to maintain the fundamental law of the Constitution was entrusted to the court and that "the discharge of that duty requires it not to extend any decision upon a constitutional question if it is convinced that error in principle might supervene." Cf. *State v. Savidge*, 144 Wash. 302, 258 Pac. 1.

Death resulting from an intentional or negligent act of a person has a two-fold aspect. Such act violates a duty owing to the person killed, and it violates a duty owing to the family of the decedent. The right to life of the person killed, and the right of his family to his affection, society, companionship and comfort, together with the loss of the benefit of his earnings, if any, have been subverted. That these are the certain effects of such death I propose to show.

Colorado was directed by Section 4 of the Enabling Act to adopt a constitution "republican in form * * * and not * * * repugnant to the constitution of the United States and the principles of the declaration of independence." The Declaration of Independence resorted to absolutes; language was used which could only be construed as viewing the utterances therein contained as being timeless and as stating eternal verities. How else can we evaluate the words that men "are endowed by their Creator with certain unalienable rights; that among these rights are life, liberty and the pursuit of happiness.

That to secure these rights, governments are instituted among men. . . ."

Obedient to the mandate of the Enabling Act, the constitutional convention framed our Constitution, submitted it to the people of the proposed State of Colorado, and the people adopted it. Article II thereof declared the rights of the individual citizen and is designated the Bill of Rights.

The Bill of Rights in applicable part provides: "In order to assert our rights, acknowledge our duties, and proclaim the principles upon which our government is founded, we declare:

\* \* \*

"Section 3. Inalienable rights. — All persons have certain natural, essential and inalienable rights, among which may be reckoned the right of enjoying and defending their lives and liberties; of acquiring, possessing and protecting property; and of seeking and obtaining their safety and happiness.

\* \* \*

"Section 6. Equality of justice. — Courts of justice shall be open to every person, and a speedy remedy afforded for every injury to person, property or character; and right and justice should be administered without sale, denial or delay.

\* \* \*

"Section 25. Due process of law. — No person shall be deprived of life, liberty or property, without due process of law."

Beyond contention, the quoted portions of the Constitution proclaim the right of a person to his life and the duty of another person not to destroy that life through intentional or negligent act. When the Declaration of Independence said that a man had certain unalienable rights and that *among* these are life, liberty and the pursuit of happiness, the word "among" definitely indicated that there are other "unalienable rights" besides those mentioned. Our Constitution, seeking to

precisely follow the mandate of the Enabling Act, said that "[a]ll persons have certain natural, essential and inalienable rights, *among* which may be reckoned the right of enjoying and defending their lives," etc. The word "among" in both contexts has significance. Among these rights not enumerated are those relating to the family and its members. Of these much more will be said later.

No state shall "deprive any person of life, liberty or property without due process. . . ." 14th Amendment, Federal Constitution. The right to the enjoyment of life is a fundamental or natural right not derived from or created by the Federal Constitution; the 14th Amendment only safeguards this right from subversion by state action. *Screws v. United States,* 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495, 162 A.L.R. 1330. For this court to deny a right of redress through some effective procedure where a life has been taken as the result of a wrong would be action in violation of the federal mandate. See *Gibbes v. Zimmerman,* 290 U.S. 326, 54 S.Ct. 140, 78 L.Ed. 342.

The constitutional assurances that a person has a natural, essential and inalienable right to enjoy his life and that it may not be taken away without due process of law can mean little if, through the wrongful act of another, he loses his life, and because he is dead there is no injury and no damage. And if the person whose life is taken happens to be a baby or a child of tender years or a teen-age child who, because of some bad condition of health, is a financial burden on his parents, such parents can prove no pecuniary loss and hence are not damaged. These fine words — that one has a natural, essential and inalienable right to enjoy his life — judicially placed in such a context, become empty words; they are "full of sound * * *, signifying nothing."

The Enabling Act wanted these words to be vital, to have life and utmost meaning. The wrongful death act should have been construed in such manner as would

have breathed life into these constitutional provisions. Contrary to the letter and the spirit of constitutional language, this court rendered lifeless and dead these constitutional rights. Constitutions are not abstractions, and it was never intended that we equate these fundamental and sacred rights with concepts which in reality mean nothing.

When the people of this state proclaimed that this right to life was natural, essential and inalienable, neither legislature nor court had the power to drain these words of all meaning. If the legislature had failed to provide a remedy for the taking of a human life through fault or wilful wrong, this court would have been resourceful in providing such remedy. The rights protected by the Bill of Rights have efficacy because the Constitution in respect to them is self-executing. *Quinn v. Buchanan,* (Mo.) 298 S.W. (2d) 413; *Perkins v. Cooper,* 155 Okla. 73, 4 P. (2d) 64; *Burnham v. Bennison,* 121 Nebr. 291, 236 N.W. 745; *Payne v. Lee,* 222 Minn. 269, 24 N.W. (2d) 259; See *Lyons v. Longmont,* 54 Colo. 112, 129 Pac. 198.

In holding that the rights declared to exist under the Bill of Rights are self-executing, the Supreme Court of Missouri, in the case of *Quinn v. Buchanan,* went on to say that "[i]n the absence of legislation, individuals may enforce and protect these rights from infringement by other individuals by any appropriate common law or code remedy."

It should be our conclusion that a human life may not be destroyed through fault without a remedy to that which succeeds the decedent. His estate should be allowed to bring suit for such damages as the decedent could have recovered had he lived, and should be allowed to recover further damages resulting from the death itself. The measure of the recovery should be the value of the life of the decedent if he had not come to such untimely end, and in considering this formula the jury should have the right to take into account whatever the

decedent may have accumulated in the way of property during his or her life.

Law develops and grows, and perhaps in no field of the law has this evolutionary process been more noticeable than in the recognition of rights arising out of the family relationship. It has already been suggested that the enumerated rights in the Enabling Act and in the Constitution are not the only natural rights preserved and protected by these fundamental documents. The enumerated rights are "among" the rights which inhere in the person. The law has enlarged its knowledge of natural rights and has been confirming rights as natural and inalienable which grow out of family ties.

To us this should represent a healthy growth in the law. Although it is too late for this court to be in the vanguard, it can fall in with the ranks of those which have realized the existence of these fundamental rights. "Individual Interests in the Domestic Relations" by Roscoe Pound, 14 Mich. L. Rev. 177; Annotations, 12 A.L.R. (2d) 1178 and 162 A.L.R. 824; *Daily v. Parker,* 152 F. (2d) 174, 162 A.L.R. 819; *Heck v. Schupp,* 394 Ill. 296, 68 N.E. (2d) 464, 167 A.L.R. 232; "The Natural Law" by Heinrich A. Rommen, p. 239. Examples abound in which the law has recognized the natural right of the family to the retention of its integrity. Injury to a member has residual damaging effects upon the family as a unit and to the members thereof. These rights are, if anything, more greatly set at naught by a death through wrong than by an injury through wrong.

Causing an estrangement between husband and wife involves "the rights which all members of the family have a right to protect. Not only does every member of the family have a right to protect the family relationship, but the state likewise has an interest in the sacredness of the family relationship." *Heck v. Schupp,* supra.

"Our conclusion, without going further into the matter, is that a child today has a right enforceable in a court of law, against one who has invaded and taken from said

child the support and maintenance of its father, as well as damages for the destruction of other rights which arise out of the family relationship and which have been destroyed or defeated by a wrong-doing third party. * * *

"On this subject of the family and the rights and obligations of its members, there has been a change in the accepted view of the status of the wife and the children. The courts have been rather slow to follow this accepted change. But they have belatedly accepted it and when once they accepted the change they have made law by their decisions." *Daily v. Parker,* supra.

An ever-expanding body of law has conceived the family to be a unit, the destruction of which is an actionable wrong to the child whose security and interests are thereby imperiled. *Johnson v. Luhman,* 330 Ill. App. 598, 71 N.E. (2d) 810; *Miller v. Monsen,* 228 Minn. 400, 37 N. W. (2d) 543; *Lacher v. Venus,* 177 Wis. 558, 188 N.W. 613, 24 A.L.R. 403

In this state it has been held that government should never interfere "with the natural rights of man except only when it is essential for the good of society," and it is said that "the state recognizes and enforces the right which nature gives to parents to the custody of their own children, and only supervenes with its sovereign power when the necessities of the case require it" *Wilson v. Mitchell,* 48 Colo. 454, 111 Pac. 21, 30 L.R.A.N.S. 507.

When these relationships are disrupted, either by injury or death, what damages should be visited upon the wrong-doer? The damages should be the natural product of the act. These damages involve mental anguish, loss of love and affection, the society and companionship, the loss of protection and comfort, and the loss of the decedent's earnings, if any, resulting from the injury or death. *Daily v. Parker,* supra; *Lacher v. Venus,* supra; *Stephens v. Weigel,* 336 Ill. App. 36, 82 N.E. (2d) 697; *Hayward v. Yost,* 72 Ida. 415, 242 P. (2d) 971.

To deny mental anguish resulting from the wrongful death of a member of the family places this court in a

most anomalous situation. For we have recently said that one must respond in damages for mental anguish for molesting the body of a deceased child. *Spomer v. City of Grand Junction,* 144 Colo. 207, 355 P. (2d) 960. A parent may not be recompensed for the mental anguish resulting from the injury or death of his or her child, but may be recompensed for such anguish where the clay to which it has been reduced in death has been disturbed. This is the present state of the law in Colorado!

A child of tender years may lose an arm through the fault of another and the latter will have to respond in damages. This child may sustain the loss of both arms and the loss possibly of both legs through the fault of another, and the latter, as the losses increase, will have to respond in greater damages. But if this other person causes the death of this child, parties entitled to sue, being unable to show that they sustained any pecuniary loss by reason of the death, cannot hold the wrongdoer liable for anything. This is a travesty, and it is the only instance within my knowledge where the part has more value and is greater than the whole.

Because of what has been said in this opinion, I would say that two natural rights are violated, the right of the individual in that her life has been taken, and the rights of her family and the members thereof, and that damages should be allowed in both these respects.