No. 21807.

GERALD W. HARMAN AND LOUISE HARMAN *v.* CHARLES ROBERT CHASE, DAVID DIX, DONNA CHASE (NEE MOWRY), ROSE ANN MURPHY, THOMAS CHASE, BERTHA M. CHASE AND JANE DIX.
(417 P.2d 784)

Decided September 6, 1966.

JORGE E. CASTILLO, for plaintiffs in error.

ROBERT L. KNOUS, JOHN E. BUSH, for defendants in error.

*In Department.*

Opinion by MR. JUSTICE MOORE.

PLAINTIFFS in error will be referred to as plaintiffs, and Charles Robert Chase will be referred to as the defendant. Although there were other persons named as defendants in the trial court there was no evidence which tended to establish a claim against them, and the case as to them was properly dismissed at the close of plaintiffs' evidence.

Plaintiffs were the parents of one Derald James Harman who was sixteen years of age at the time of the fatal accident which caused his death under the following circumstances: On February 12, 1961, Derald, his father, and one Donahue, drove from Idaho Springs up Virginia Canyon to the abandoned mining property known as "Novelty Mine." They entered the mine tunnel and with the aid of lights were exploring the interior of the abandoned mine in search of ore samples. They remained in the mine for a substantial period of time (estimated from 45 minutes to 1½ hours). They started to emerge from the mine at about 4:10 P.M. Their lights were burning but they could not see daylight from within the mine. On the way out of the tunnel Derald was hit by a bullet admittedly fired into the mouth of the tunnel by the defendant Charles Robert Chase.

On the above mentioned date the defendant, his friend David Dix, and their two girl friends had gone target

shooting. Their plans were to have dinner in Idaho Springs after their target practice and then return to Denver. They went to the vicinity of the mine which Derald and his father had previously entered and engaged in their target practice, after which the following events took place as related by the defendant in his testimony:

"A. Well, we decided to go back to Idaho Springs and the girls and Dave were getting in the car; I stood on the mine dump, which was out about here before this slopes down. (Indicating) I was standing on the edge about here.

"Q. Would you mark that point number 10.

"A. (Witness complied.)

"Q. You were standing at point number 10?

"A. Yes.

I had Dave's rifle and I was going to unload it. There was still ammunition in it. My weapons weren't there; Dave took those back to the Jeep; and I shot down the dump here at a tire. Do you want that 11?

"Q. Yes.

"A. I turned and I shot a window out at a shack, number 7. I then turned and shot the smoke stack, and then turned and shot into the mine.

"Q. When you shot into the mine, you were shooting from the hip, weren't you?

"A. Yes.

"Q. And then after you shot into the mine, what, if anything, happened next?

"A. Well, the first thing I remembered seeing a flash of light and then I could hear talking noise. It probably was Mr. Harman yelling or something, and I thought it was an echo.

"Q. I think you can get back to your chair now.

(Witness resumed witness stand.)

You said you heard some voices and you saw a flash of light?

"A. Yes, sir.

"Q. Now, how far were you at the time that you saw the light from the entrance to the mine?

"A. Fifty feet.

"Q. All right.

Then after you heard the voices and saw the light, what happened?

"A. Mr. Harman came running out of the mine saying that — his first statement was, 'Why don't you have any better sense than to be shooting in the mine?' or on that general order. 'What are you doing, shooting in a mine'?

"And then he said, 'You shot my boy.'

"And I said, 'How bad?'

"And he said, 'You shot him in the shoulder.'

"Then he ran back in the mine and beckoned us to come to help him. Dave and I were a little reluctant to go in the mine, but it was only a matter of seconds before we followed him in.

"He was, oh, thirty feet ahead of us all the way down the tunnel.

"Q. And you went into the mine?

"A. (Nodded head.)

"Q. And how far was Derald Harman's body from the entrance to the mine?

"A. I can only give you an approximate distance, because I don't remember, but it was approximately 168 feet, if I remember right, because we measured it the next day."

At the close of all the evidence the plaintiffs moved the court for a verdict in favor of them against the defendant as to liability. This motion was granted. They further moved that the court instruct the jury to return a verdict that the conduct of the defendant was wanton, willful, and in disregard of the rights of others. This motion was denied. The case went to the jury on the question of whether the acts of the defendant were wanton and willful, and for determination of the amount of damages sustained by plaintiffs. The verdicts found

the defendant not guilty of wanton and willful conduct, and assessed the damages sustained by plaintiffs at the sum of $5,000. Judgment entered on the verdicts and the plaintiffs, dissatisfied with the award of damages, seek a reversal of the judgment.

### Questions to be Determined

First. *Must we as a matter of law order a new trial for the reason that the verdict of the jury is so grossly inadequate as to require a reversal of the judgment?*

■ This question is answered in the negative. Recent decisions of this court have dealt with the question of the adequacy of damages in cases in which parents brought the action to recover for the wrongful death of a minor child. *Kogul v. Sonheim,* 150 Colo. 316, 372 P.2d 731; *Herbertson v. Russell,* 150 Colo. 110, 371 P.2d 422; *Lehrer v. Lorenzen,* 124 Colo. 17, 233 P.2d 382. The language contained in the above decisions is decisive of the question, and it would serve no useful purpose to repeat it here.

Second. *Did the trial court err in refusing to give a tendered instruction to the effect that "the earnings of a minor child during his minority belong, by law, to his father"?*

■ This question is answered in the negative. The plaintiffs tendered an instruction which included the quoted portion of the above-stated question. The court refused it and on that subject it instructed the jury as follows:

"The net pecuniary loss sustained by the plaintiffs by reason of the loss of their son includes the funeral expenses incurred by them in addition to the pecuniary benefit which the plaintiffs might reasonably have expected to receive for the continuation of his life."

Although the foregoing instruction should not be considered a model for future use, nevertheless under the factual situation disclosed by the record in this case it was sufficient to cover the plaintiffs' claim in this connection. With reference to the earnings of Derald the

father testified that, "We always told him to keep it and buy himself stuff, which he did."

Third. *Did the trial court err in refusing to direct the jury to return a verdict that the act of the defendant in discharging a firearm into the mouth of the mine tunnel amounted to negligence consisting of a reckless or willful disregard of the rights of others?*

■ This question is answered in the negative. We know of no decisions of this court in which a trial court has been reversed for refusal to direct a verdict that a defendant has been guilty of negligence consisting of a reckless or willful disregard of the rights and safety of others. Our decisions on this phase of tort actions have generally dealt with the contention that there was insufficient evidence upon which to warrant an instruction to the jury on the subject. See *Fanstiel v. Wright,* 122 Colo. 451, 222 P.2d 1001.

In the instant action the jury was properly instructed and returned a verdict that the negligence of the defendant was not in wanton or willful disregard of the rights and safety of others. We have read the entire record and we cannot say as a matter of law that the facts and circumstances surrounding the shooting are such that reasonably minded persons could not have decided this question as the jurors did in this case.

■ There is no merit to the contentions that the trial court erred in excluding evidence offered, and in dismissing the action as to the defendants other than Charles Robert Chase.

The judgment is affirmed.

Mr. Justice McWilliams and Mr. Justice Pringle concur.